**Francis K. FONG, Plaintiff,**

v.

**PURDUE UNIVERSITY, an Indiana State University Kenneth Kliewer, Hean of the School of Science; and Varro E. Tyler, Executive Vice President for Academic Affairs.**

**Civ. No. L 88–30.**

United States District Court, N.D. Indiana, Hammond at Lafayette Division.

Aug. 10, 1988.

Peter V. Baugher, Adams, Fox, Adelstein & Rosen, Chicago, Ill., for plaintiff.

John F. Bodle and William E. Emerick, Stuart & Branigin, Lafayette, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### INTRODUCTION

The plaintiff, Francis K. Fong, filed this action on April 7, 1988, to enjoin officials of Purdue University from allegedly attempting to silence him and drive him from his tenured position on the Purdue faculty. Dr. Fong asserts that the defendants' conduct violates his First and Fourteenth Amendment rights. His complaint purports to allege claims under 42 U.S.C. § 1983. The complaint invokes this court's federal question jurisdiction under 28 U.S. C. §§ 1331 and 1343(a)(3) and (4). As was highlighted at the outset by the court, this suit is for injunctive relief as opposed to damage relief, and it could not be otherwise under the Eleventh Amendment immunity principles set forth in *Kashani v. Purdue University et al.,* 813 F.2d 843 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987). *See also, Shannon v. Bepko,* 684 F.Supp. 1465 (S.D. Ind.1988).

This court has cautioned that these proceedings will not be used as a public forum for personal revenge against a long list of officials who, for legitimate reasons, chose not to take up a cause for which they had no legal responsibility. Neither the law, nor the university's policies can be read to impose an affirmative duty on the part of Purdue, to tilt all the windmills of all its employed geniuses, however correct their theories and research might ultimately turn out to be. An array of intense interpersonal conflicts has developed between this plaintiff and many others at Purdue and elsewhere. The list of alleged villains in this case includes, among others, certain individuals from the United States Attorney's office, the Justice Department, the Federal Bureau of Investigation, the Tippecanoe County Prosecutor's office, the National Science Foundation (NSF), the Purdue faculty and administration, the Indiana State Police, and the Governor of Indiana. The plaintiff alleges that the defendants conspired with the above individuals in an attempt to silence him from "blowing the whistle" or from prosecuting his claims.[1]

There can be no question about the fact that Dr. Fong wanted the officials at Purdue University to join his frontal assault on the National Science Foundation. There can also be no doubt that Dr. Fong wanted the persons in his own scientific discipline at Purdue University and elsewhere to join him in his two decades-long battle to discredit the opposing scientific viewpoint of Professor Melvin Calvin of University of California at Berkeley. To the extent that one of the realistic purposes of this lawsuit is to achieve either or both of these results, such is well beyond even an expansive activist view of the proper functions of this court.

As a final preliminary comment, this court has emphasized its unwillingness to be placed in the position of judging Dr. Fong's science. That judgment is here neither necessary nor appropriate. The president of Purdue University and others have said kind things in this court and elsewhere about the scientific accomplishments of Dr. Fong. There is evidence in the record indicating that all the persons expert in his scientific discipline are not of one mind on

---

1. As a matter of tangential clarification, the plaintiff's "whistleblower" theme is here misplaced. This court is well familiar with the long history of such classic whistleblower cases as *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 396 (1982), and cases related thereto. Simply put, and as developed more fully in the body of this opinion, this is *not* such a case. The circumstances here are light years away from the kind of evidence in the record of the *Fitzgerald* cases.

the relevant subject of photosynthesis. However, this is not a bridge to be crossed here by this court. In a most generalized way, the dimensions and characteristics of photosynthesis probe very deeply into the nature of the universe and the nature of life itself in that universe. To determine the ultimate question of scientific truth in this deeply disputed context is well beyond either the requirements of this court in this case, or the capacity of this court in a generalized sense. Here, this court is required to decide a much narrower dispute within clearly established parameters under the First and Fourteenth Amendments of the Constitution of the United States.

In addition to sorting through the factual morass that has developed over the course of more than a decade, the court must address, A) the proper office of preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure in this circuit, and B) the historical and current requirements under 42 U.S.C. § 1983. The court will then examine the nature of the plaintiff's claims here, in the pleadings and in the course of these proceedings, with respect to the major issues of procedural and substantive due process. Procedural due process will be addressed and dealt with at length, although during the hearings certain related questions then appeared unripe. In addressing substantive free speech rights of this professor as a public employee at a state university, the court will discuss the standards governing the university's alleged retaliation, and in so doing must examine the alleged nexus between any arguably protected speech exercised by the plaintiff, and the university's decision to initiate censure and dismissal proceedings.

## A.

### PRELIMINARY INJUNCTION

■ In ruling on an injunction the court considers four factors, as recently reviewed by this court in *Naked City, Inc. v. Aregood,* 667 F.Supp. 1246, 1256 (N.D.Ind. 1987), and cases cited therein. To obtain a preliminary injunction, a plaintiff must demonstrate: (1) a threat of irreparable harm without an adequate remedy at law; (2) some likelihood of success on the merits of the claim; (3) a balance of relative harm weighing in favor of granting the injunction; and (4) compatibility of the injunction and the public interest. *Id.,* citing *Chicago Board of Realtors, Inc. v. City of Chicago,* 819 F.2d 732, 735 (7th Cir.1987).

These criteria have been similarly, but otherwise stated as being that the plaintiff bears the burden of demonstrating (1) inadequacy of a remedy at law; (2) irreparable harm absent issuance of the injunction; (3) greater irreparable harm than the defendant would suffer if an injunction were granted; (4) a reasonable likelihood of prevailing on the merits; and (5) a lack of harm to the public interest, should the injunction be granted. *Kowalski v. Chicago Tribune Company,* 854 F.2d 168, (7th Cir. 1988); *Curtis v. Thompson,* 840 F.2d 1291 (7th Cir.1988); *see also, Brunswick Corporation v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986); *Roland Machinery Corp. v. Dresser Industries, Inc.,* 749 F.2d 380, 382–88 (7th Cir.1984).

For the reasons set forth fully in this opinion, the plaintiff's motion for preliminary injunction must be denied under either analysis. Dr. Fong fails to show a reasonable likelihood of success on the merits of either his First or Fourteenth Amendment claims. His cause also fails in terms of the balancing test. Finally, in the opinion of this court, to grant an injunction here would not be compatible with the public interest.

## B.

### UNITED STATES CODE

### TITLE 42, SECTION 1983

Pursuant to § 1983:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

To bring a successful § 1983 claim, the plaintiff must prove that the defendant deprived him of a right secured by federal law or the Constitution while acting under color of state law. *Bergren v. City of Milwaukee,* 811 F.2d 1139 (7th Cir.1987); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1339 n. 1 (7th Cir.1985). Otherwise stated, § 1983 requires proof that

> (1) defendants acted under color of state law, (2) defendants' actions deprived plaintiff of ... rights, privileges or immunities guaranteed by the Constitution, and (3) defendants' conduct proximately caused plaintiff's deprivation.

*Volk v. Coler,* 845 F.2d 1422 (7th Cir.1988), quoting *Webb v. City of Chester, Illinois,* 813 F.2d 824, 827 (7th Cir.1987).

In the interest of crystallizing the legal issues here, this court pointed out at the outset of the proceedings, that allegations of defamation, damage to reputation, and inability to enlist research assistance, will not, without deprivation of a recognized liberty or property interest, support a § 1983 claim. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Elliott v. Hinds,* 786 F.2d 298 (7th Cir.1986); *Bone v. City of Lafayette,* 763 F.2d 295 (7th Cir.1985); *Lawson v. Sheriff of Tippecanoe County,* 725 F.2d 1136 (7th Cir. 1984). Thus, one of the threshold issues to be addressed is the nature of the plaintiff's liberty and property interests in Purdue University employment.

Historically, in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) the Supreme Court pointed to three main purposes for § 1983: (1) to override state laws which impinge on constitutional rights and privileges; (2) to provide a federal remedy where the remedy provided by state law was inadequate; and, (3) to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice. *Monroe* concluded that the adequacy of a state law remedy was irrelevant and that it need not be sought and refused before involving the federal remedy. This conclusion, along with an expanded definition of "under color of law," led to an increase in federal court civil rights cases. For a thorough review of the history and development of § 1983 law subsequent to *Monroe,* see *Barnier v. Szentmiklosi,* 565 F.Supp. 869 (E.D.Mich.1983), reversed in part for other reasons, 810 F.2d 594 (6th Cir.1987).

Two types of cases developed in relationship to alleged constitutional violations. One type was based on violations of the provisions of the Bill of Rights or other substantive guarantees applicable to actions of state officials by virtue of Fourteenth Amendment incorporation. The second type of case involved purely procedural due process claims brought under the Fourteenth Amendment. *Barnier,* 565 F.Supp. at 874. Both types of claims are raised here, and will be reviewed separately after a general recitation of the facts here presented.

At the conclusion of the hearing in Lafayette, Indiana, on April 28, 1988, this court requested that counsel simultaneously file and exchange briefs on the evidence by June 6, 1988. This was agreeable. The plaintiff thereafter requested an extension to June 20, 1988, and the same was granted as to the filings by *both* parties. The defendants filed such brief on June 17, 1988, at 3:33 p.m. The plaintiff filed such brief on June 24, 1988, with benefit of the defendants' brief. The matter is now ripe for determination. The findings of fact and conclusions of law contained herein are intended to satisfy the requirements of Rule 52 of the Federal Rules of Civil Procedure.[2]

---

**2.** The court here notes that on July 19, 1988, the plaintiff filed a Motion to Supplement the Record, asserting by the affidavit of Dr. Fong, that Dr. Varro Tyler had falsely testified that the chairman of the hearing committee, Dr. Wayne Perry, had requested that security officers be present at the hearings. According to Dr. Fong, Dr. Perry had assured him otherwise in a telephone conversation on June 29, 1988. On July 27, 1988, a letter was filed in this court, which

## TESTIMONY

Francis Fong was born in Shanghai, China in 1938, and came to the United States in 1956 to attend Princeton University, where he completed his Ph.D. in 1962. After about three years of research, Dr. Fong came to Purdue University in January of 1968 as an associate professor. He became tenured in 1969, and was a full professor in 1972 at the age of thirty-three. In 1973 Dr. Fong changed his field of study from dead to living substances. By 1976 he began formulating a theory of photosynthesis, which contradicted the prevailing theory of Nobel Prize winner, Melvin Calvin.

According to Fong, prominent persons in the scientific community, notably those associated with the National Science Foundation (NSF), knew as early as 1955, that Calvin's "dark theory" of photosynthesis was incorrect. This knowledge was allegedly kept quiet by political forces in the NSF, and others, who, according to the plaintiff, fraudulently restricted funding for any research that ran counter to the Calvin school of thought.

In 1976 Dr. Fong began formulating his "light theory" of carbon reduction, whereby the process of photosynthesis could be used to split water into hydrogen and oxygen in sunlight. The sun, as a virtually inexhaustible supply of energy, could thus be tapped in a manner that would have profound implications in terms of solving the industrial world's energy crisis. While this outcome was predicted in 1976, Dr. Fong and his students were able to demonstrate the theory in 1978 laboratory experiments. Using common spinach plants, a chlorophyll "water splitting" reaction was shown. In effect, photosynthesis could conceivably be used to produce electricity. The results were reported in a scientific

publication, and were picked up by a Scott and Forseman biology textbook published in 1980. The work of Dr. Fong and his students apparently brought about a dichotomy of thinking in the field of photosynthesis.

According to Dr. Fong, the more his research progressed, the more trouble he encountered from the NSF and certain persons at Purdue, who, in his view, conspired to prevent him from pursuing his research. In 1979 Dr. Fong attended a photochemistry conference organized by Professor Calvin, and from this conference submitted two grant proposals to the NSF. The plaintiff's proposals were reviewed by a committee of anonymous referees. Dr. Fong testified that one of the referees used wording that was highly likely to have been chosen by Dr. Calvin himself, who had exclusive access to certain information as a principal consultant of one of the General Electric Company's research groups. Fong referred to the word selection as "almost like a fingerprint" of Calvin.

When one of the plaintiff's two proposals was rejected at the lower level of review, Dr. Fong, assertedly on the advice of the NSF director, initiated a reconsideration process. The plaintiff testified that in late September of 1979, Dr. Dale Margerum, then the chairman of Dr. Fong's department, asked the plaintiff to back away from pursuing reconsideration. Allegedly, Dr. Margerum stated a concern that if the proposal reached the level of Dr. Pimentel, who was then the deputy director of NSF and successor to Calvin at Berkeley, there might be reprisals against the university in terms of its grants and funding. Dr. Fong also testified that Dr. Margerum threatened to wipe out his research if he did not pull back from seeking a reconsideration.

was sent by Dr. Perry to Dr. Fong. Dr. Perry therein clearly denied and denounced the representations of Dr. Fong that such conversations had taken place. The plaintiff subsequently filed a re-affirmation of his representations, stating that a tape recording of said conversation could be made available to verify Dr. Fong's position on this matter.

This plaintiff has been given the final bites of this apple long after the factual record was closed and the briefing schedule extended at his

request. While the final belated affidavit of the plaintiff forecloses further confrontation by the defendants, neither position has gone without some consideration and challenge. In all events the discussion relates to an obscure point in the total scheme of things in this dispute. It is most difficult to see how this plaintiff's procedural or substantive constitutional rights were in any way infringed upon by the decision to have security guards present at the university hearings.

Dr. Margerum firmly denied these allegations, stating flatly that Dr. Fong's statements were lies. The issue of credibility will be discussed at length, later in this opinion.

At this point in the saga, Dr. Fong wrote to NSF and to Dr. Pimentel, informing them of Dr. Margerum's alleged statements. NSF responded with a confirmation of Dr. Fong's right to pursue reconsideration. The plaintiff testified further that Provost Haas of Purdue offered $45,000 from the Purdue Research Foundation to comply with Dr. Margerum's request that he stop pursuing reconsideration. Reportedly, Dr. Margerum's request resulted from his alleged conversations with three NSF officials, named by Fong as Ken Hancock, program director for one of the rejected proposals, Arthur Kowalski, program director for the other proposal, and Dr. Fred Findeis, a former Purdue alumnus. Dr. Margerum denied the alleged content of any such conversations as being coercive.

Dr. Fong testified that in July of 1980 a committee was formed to review his research difficulties, which was made up of Purdue Vice Presidents Greenkorn, Brown, and Fischang. On October 24, 1980, the committee reported to Provost Haas that, in its opinion, Dr. Fong should address questions about his salary and the review of his NSF proposal, to University Grievance Procedures for Academic Personnel. Dr. Fong testified that the document was a "secret document" of which he was not even aware until the recent proceedings.

According to Dr. Fong, from a study of all the papers published by Dr. Calvin and his students and associates on the subject of carbon dioxide reduction, it was evident that all along the Calvin group knew that carbon reduction was a light process, not a dark process. Upon making this discovery, Dr. Fong contacted the editor of the Journal of American Chemical Society, Dr. Calvin himself and Dr. Pulitz of the Department of Energy. When Calvin did not respond to the relevant inquiries, the plaintiff began publicly questioning him by letters which were distributed to many people.

In the October, 1981, issue of "Mosaic", a scientific publication of the NSF, it was stated that Dr. Fong's work had not been replicated by others. That statement has since been shown to be false. Dr. Fong was able to discover that the article had been written by the General Electric Corporation. After contact from the plaintiff's earlier attorney, General Electric printed a retraction in 1983.

Beginning in about December of 1983, staff members of Senator Richard Lugar began reviewing Dr. Fong's problems and concerns. According to the plaintiff, upon confirmation that his scientific concepts were corroborated, mostly by foreign scientists, Senator Lugar "decided to take direct action," by writing letters to Energy Secretary Hodel and the NSF Director, suggesting that they sponsor workshops to discuss both views of photosynthesis. Plans for such a workshop died in the midst of a controversy over the content of the workshop and the issue of having the proposal reviewed by a peer review committee.

Meanwhile, Dr. Fong continued his research, focusing on the conversion of sunlight into electricity, the splitting of water into hydrogen and oxygen, and the reduction of carbon dioxide to core organic matter. The discoveries gleaned from these studies led to the examination of the photophysical chemical properties of all the systems, ultimately resulting, according to Fong, "in a recent discovery of the entire mechanism for the carbon reduction process."

Dr. Fong testified that it was at about this time that Provost Haas, in the fall of 1983, initiated a "restitution and restoration process" for the purpose of clearing the plaintiff's name and reconsidering his salary. In the course of this process, Dean Allen Clark allegedly solicited some reviews which called Dr. Fong's work a fraud. Fong testified that the censure and dismissal hearings had revealed that the names for these reviews had been suggested by Dr. Harry Pardue, the plaintiff's department head.

Dr. Fong further testified that Dean Clark's negative recommendations were re-

jected by President Beering, with whom the plaintiff met on May 15, 1984. At that time, Dr. Beering reportedly criticized Dr. Margerum's behavior with respect to threats and fears of reprisals. The court notes that Dr. Beering remembered those conversations quite differently than did Dr. Fong. According to the plaintiff's review of events, he and Dr. Beering reached a "comprehensive agreement" in August of 1984, to restore him to his proper place in the academic community. According to Fong, the agreement was never fulfilled. According to President Beering, there was never such an agreement.

In October of 1984, Dr. Fong sustained some head injuries in an automobile accident. During the course of his recuperation, a Gas Research Institute grant was processed by the Purdue University Research Foundation, and a long-term commitment by the Gas Research Institute was lost. About a year later Science Magazine published an article submitted by a Dr. Greenbaum, a former colleague of Dr. Fong at the Gas Research Institute who was familiar with Dr. Fong's work. No credit was given to Dr. Fong, which caused Dr. Fong to view the article as plagiarism. In support of Fong, Professor Austin Angell, of the Purdue Science Department sent a letter to the magazine which indicated that the Greenbaum article presented no new claims. On another occasion, Dean Yackel, the acting dean of the School of Science, also spoke in Dr. Fong's behalf, by sending a letter to the Chemistry Executive Committee on March 3, 1986, shortly before Dr. Fong's annual evaluation of performance as a scientist.

In July, 1986, Acting Dean Yackel became Associate Dean of the School of Science, Provost Haas became Distinguished Professor of Mathematics, and Kenneth Kliewer became the new Dean of Science. Varro Tyler became a new Vice President for Academic Affairs. Drs. Kliewer and Tyler are named defendants in this case.

Dr. Fong testified that during that summer of 1986, he remained in touch with Senator Lugar's office. At the same time, according to the witness, Dr. Beering had authorized an "internal investigation" of the plaintiff's situation at Purdue. During the same summer, and again in September, it appears that someone broke into Dr. Fong's office. In the course of these events, materials were allegedly taken which related back to matters occurring in the fall of 1981. Dr. Fong reported these break-ins to campus authorities.

At some point during the summer, Dr. Beering was said to have authorized a joint meeting of the new staff to consider Dr. Fong's problems. On October 8, 1986, Drs. Tyler, Varro, Kliewer, Pardue, Fong and Beering met for about one and-a-half hours. According to Dr. Fong, in the early part of the meeting, Dr. Beering discussed the August, 1984, "contract", the terms of which could not be consummated until the new group of administrators were together. According to Dr. Fong, President Beering's recording of that meeting, as well as the transcript, were altered to remove the president's alleged directive that Deans Tyler and Kliewer were to perform the contractual agreement that had been arranged with Dr. Fong.

Richard Kemmer, a Purdue University tape recording technician, testified that upon receiving the tape from Lieutenant Gibson, he made an accurate copy of the tape, which was picked up, along with the original, by Lieutenant Gibson. Mr. Kemmer testified that he made no changes or alterations of either the tape or the copy. Mr. Kemmer stated that upon listening to Dr. Fong's copy of the tape later, he noted that some of the words seemed to be abruptly cut off, as if someone had tampered with the tape. On cross-examination the witness acknowledged that he had no way of knowing if the tape brought back by Dr. Fong was the same tape he had copied. He also stated that he had no knowledge of anyone having done anything maliciously or intentionally wrong in connection with any of the tapes. He reiterated, however, on redirect that he had indicated to Dr. Fong that the tape seemed to have been tampered with by someone.

In recalling the events which were said to have transpired shortly after that Au-

gust meeting, Dr. Fong discussed a second meeting at which it was said to have been determined that Dean Kliewer would allow a letter to be sent in his name, protesting an NSF magazine article which had discounted Dr. Fong's work. Dr. Kliewer supposedly had also agreed to review Dr. Fong's secretarial support. As a result, he was said to have ordered that the plaintiff's temporary secretary be hired as his permanent personal secretary.

Soon after the August meeting, Dr. Fong was out of the country for a time. Upon his return he was informed that his secretary's time would be split with another office, allowing him three hours a day. When the plaintiff inquired about why the changes had been made, Dr. Kliewer reportedly responded that Dr. Fong would be treated just like everyone else. Dr. Fong interpreted this statement to mean that the terms of his "contract" would not be honored.

Along with these events, according to Dr. Fong, an "internal investigation" was in the process of being organized. Believing that something "very wrong" was happening, Dr. Fong informed Dr. Robinson, his associate department head, that he intended to attempt to transcribe his own tape recording of one of the meetings at which the "agreement" had been discussed. While in the process of doing so on January 9, 1987, Dr. Fong reportedly was invited to have coffee with Dr. Robinson. While away from his office, someone removed both the tape and the floppy disk upon which Dr. Fong had intended to put the transcription. The incident was reported to the Purdue police and, allegedly on the advice of attorneys, to the Board of Trustees. Dr. Fong further stated that he first gave Dr. Beering's office an opportunity to respond to his concerns before contacting other persons.

At this point in time, Dr. Fong and his family were preparing to go on a ski vacation, when they reportedly received a mysterious telephone call of an harassing nature, which caused Dr. Fong to contact the Tippecanoe County prosecutor's office, a state representative, and the Attorney General's office. These events took place in May of 1987, at which time Dr. Fong reported the break-ins of July 1986, September 1986, January of 1987, and the telephone call, to the state police, to Walter Valentine of the Lafayette F.B.I. office, to Mr. Valentine's supervisor, Harry McInturff in Indianapolis, to Senator Richard Lugar's office, and to the U.S. Attorney's office in the Northern District of Indiana.

It was also in the Spring of 1987, that Dr. Fong became aware that a petition was circulating in the Purdue Chemistry Department for the purpose of initiating censure and dismissal proceedings against him. Dr. Fong stated that he became formally aware of the petition by a letter from Dr. Beering which was dated June 2, 1987, and which designated Dr. Kenneth Kliewer as the administrative representative to review the matter with Dr. Fong.

In mid-June, 1987, Dr. Fong met with Dean Kliewer. According to Dr. Fong the gist of that meeting was to inform him of the nature of the complaint, that being, the harassment of various people with allegations of fraud, and further to instruct the plaintiff in a method of avoiding the censure and dismissal proceedings, that being, to stop alleging such violations, specifically with respect to the "Berkeley–Purdue–NSF problem." In response, Dr. Fong informed Dr. Kliewer that the state police had advised him that he should record the meeting and report the events to the police on the basis that criminal obstruction could be involved if his livelihood were threatened. Dr. Kliewer was apparently unimpressed by these representations. Despite Dr. Kliewer's alleged directives, Dr. Fong continued to inform authorities as to his perception of the problem.

According to Dr. Fong, the threats and harassing telephone calls that Drs. Margerum and Tyler alleged they had received from him were mischaracterized, and that he had only informed them that, in the case of Dr. Margerum, a suit for money damages might be sought, and in the case of Dr. Tyler, that a resignation by him might be sought.

Dr. Fong further testified at length with respect to his ongoing conflict with Dr. Margerum, stating that at one point, Provost Haas requested that Dr. Fong write a letter in opposition to the idea of Dr. Margerum's becoming a dean. Dr. Margerum later denied the validity of these statements. In reviewing an incident of alleged mutual assault in Dr. Margerum's office, Dr. Fong stated that the incident involved the plaintiff's request for a standard form which would allow a Chinese scholar to work in his lab for a year, with expenses to be paid by the government. According to Fong, upon being denied the request, the plaintiff asked that his letter of request be returned to him so that he could seek a resolution from Provost Haas. When Dr. Margerum would not return the letter, Dr. Fong allegedly reached for it, whereupon the latter put on his hand on the former's arm, attempting to push Dr. Fong away. According to Dr. Fong, Dr. Margerum then ran to the outer office "and this in fact became the altercation." Dr. Fong stated that when he inquired about a report having been filed, the police informed him that it was just his word against Dr. Margerum's. Despite this perceived reassurance, Dr. Fong felt as if the incident had continually been used against him in a manner suggesting that he had hit Dr. Margerum, which he, in essence, denied.

Dr. Steven C. Beering, President of Purdue University, testifying under direct examination as an adverse witness, stated that over the years, since assuming the presidency in 1983, he has had numerous telephone conversations with the plaintiff. President Beering acknowledged that at various times he had discussed with Professor Fong the possibility of negotiating an agreement by which Dr. Fong would drop the threat of a lawsuit against the university in exchange for the university's investigation of problems with the NSF. The witness also stated that he had advised the plaintiff that he had not availed himself of administrative remedies and due process available at the university level.

President Beering recalled a 1985 meeting with Dr. Fong, Provost Haas, Dean Yackel and himself at which Dr. Fong's requests of various university officials were discussed. The witness denied that any such discussions involved an agreement of a contractual nature, despite the fact that Dr. Fong was known to refer to the discussions as such. Dr. Beering acknowledged that a meeting occurred at which Dr. Fong's proposed August, 1984, agreement was discussed. As the witness recalled, neither he nor Provost Haas then viewed the proposal as contractual. President Beering testified that on several occasions he had advised the plaintiff to go through recognized channels, such as his department, school and division, rather than attempting to deal directly with NSF. In so doing he emphasized the university's willingness to deal with the problems by its standard means.

Under questioning by counsel for Purdue, Dr. Beering stated that although he at first listened with some empathy to Dr. Fong's complaints about the NSF, Dr. Margerum, and others, upon further investigation he found no irregularities. Dr. Beering acknowledged that he had agreed with Dr. Fong to review his situation as well as his salary, but reiterated that he never made any agreement that could be considered a contractual commitment.

The witness recalled writing to Dr. Fong on June 2, 1987, to inform him that thirty faculty members of the School of Science had petitioned to invoke a B–48 proceeding against him, on the basis of his continuing accusations and harassment of faculty and administration. When asked if he had any personal knowledge of such conduct on the part of the plaintiff, President Beering stated:

"Dr. Fong has on repeated occasions over the years written and called and used threats and intimidation with me personally and with my office staff. He has written voluminously outside of the University to agencies of the federal government, of the state government, to newspapers, both local and national, exercising his First Amendment rights.... And he has certainly let many people know what his concerns are. He has done this in a way that has been threat-

ening and intimidating and as has been stated by his colleagues and department professors characterized as objectionable behavior."

President Beering added that Dr. Fong has also accused him falsely of criminal acts such as tampering with evidence in the form of a tape. Finally, the witness testified that a long list of exhibits constituted correspondence from him to Dr. Fong which attempted to deal with his alleged problems.

President Beering also reviewed the events surrounding the meeting of October 8, 1986, at which Vice President Tyler, Kenneth Kliewer, Dr. Fong and he, discussed the plaintiff's concerns. Again, the president at that time stressed the importance of first addressing problems at the department level. Dr. Beering taped this meeting himself, using a "hand-held dictating machine." At the conclusion of the meeting, the tape was delivered to Mrs. Kathleen Hatke, the president's assistant. Both the transcription and the tape of the meeting were placed in the office files.

With respect to the taping of the October meeting, Dr. Beering stated that he had suggested the taping, indicating that a transcript should be made for all parties. The tape recorder was not started at the outset of the conversation, and inasmuch as he had to leave early, "the entire meeting was not taped." The transcript was "similarly incomplete." Although President Beering did not know it at the time, he later learned that the plaintiff had also taped the meeting, but had lost his personal copy. When Dr. Fong requested the original tape, the university declined, but offered to make a copy of the tape for him through the audio-visual services. The transfer involved Mrs. Hatke, Lieutenant John Gibson, and Mr. Kemmer from audio-visual services.

President Beering acknowledged that Grant Kepner, Director of Security, had informed him that a charge had been made, that someone had tampered with the tape, and that the tape had, in Mr. Kepner's opinion, actually been tampered with. President Beering denied knowing anything about any alterations in the tape. He did not recall anything unusual occurring that might have caused a break in the tape, again stating that the tape was not complete in terms of taping the whole meeting.

Dr. Beering also reviewed a telephone conversation with Dr. Fong in which he acknowledged the merit and accuracy of Dr. Fong's work as a scientist. In Dr. Beering's opinion, any question about the plaintiff's reputation as a scientist had been removed. Dr. Beering also admitted having agreed to review the plaintiff's salary, which was done on several occasions. Under the university's test of "merit and market," Dr. Fong's salary and back pay expectations were not found to be justified. The witness explained that the review process involved peers within the department as well as the chairman, the dean, the vice-president, the president and the board of trustees on a yearly basis.

President Beering recalled that upon Dr. Fong's request, he had at one point contacted the NSF to determine if the plaintiff's applications had been dealt with in an unusual or extraordinary fashion. The witness was unable to detect any evidence of unfair treatment. President Beering believed that he had had about three conversations with the NSF concerning Dr. Fong's problems. He did not recall specifically with whom he had spoken on these occasions.

According to President Beering, complaints and concerns about Dr. Fong's conduct were repeated and frequent over a period of 15 years, a situation which eventually resulted in issuance of a warning to Dr. Fong that there might be serious administrative and legal consequences if he did not cease making libelous accusations and engaging in continuous harassment of the secretarial staff and faculty, his colleagues, and the university administrators. In issuing this warning, Dr. Beering had in mind that Dr. Fong's colleagues had on several occasions stated that they were ready to formally lodge their complaints about the plaintiff in the form of a faculty grievance.

The witness emphasized that he has nothing to do presently with the hearings in which members of the faculty have in fact initiated proceedings against Dr. Fong. President Beering expressed that his position is somewhat difficult with respect to the courtroom proceedings, inasmuch as he is the final arbitrar of the internal administrative faculty proceeding which remained then in progress. Once the committee has completed the hearings and has submitted a report on the charges, it will be President Beering who will make a final ruling for the university.

In response to the court's questioning, President Beering stated that in his opinion the procedures in Executive Memo B 48 do comply with the standards of the American Association of University Professors. The witness also denied having been involved in any retaliatory conduct against the plaintiff for any exercise of First Amendment rights. Finally, President Beering stated that Dr. Fong had accused him of criminal conduct in the form of tampering with evidence, as well as other offenses in the form of alleged torts and contract violations. Dr. Beering acknowledged that Frank Fong had at one time filed a notice of tort claim against the University and that a short time thereafter, on March 16, 1987, Dr. Fong was notified of the proceedings against him.

According to Kathleen Hatke, administrative assistant to Dr. Beering, a tape recording of the October 8th meeting was given to her immediately following it. She did not recall with certainty who gave the tape to her. The witness kept the tape in her drawer for a few days before giving it to her secretary to transcribe. She acknowledged that other members of the administration might have had access to her office, perhaps even after hours.

Once her secretary, Aynsley Helwer had transcribed the tape, she returned it to the witness who listened to it as she read the transcript. Both the tape and the transcript were then filed. The tape was placed in a marked envelope, and left there until Dr. Fong requested a copy, whereupon it was given to Lieutenant John Gibson to take to the audio-visual room. Mr. Richard Kemmer of the audio-visual department, received the tape there. The next day Lieutenant Gibson picked the tape up from Mr. Kemmer. The tape was returned to the envelope and the file from which it came, where it remained since. Dr. Fong suggests that someone tampered with the office copy to delete Dr. Beering's reference to a "contract" between Fong and Purdue.

Upon examination by the defendant's attorney, Kathleen Hatke stated that she had been harassed by Dr. Fong on the telephone at some point between 1977 and 1983. She indicated that he had asked how much money she made and had stated, "by the time I get finished with you, you will need a lot more money and you will have nothing left." At the time, the witness was the administrative assistant to President Hansen. She denied having any feelings one way or another about Dr. Fong as a result of this incident.

Dr. Dale Margerum testified that he came to Purdue in 1954 as an inorganic and analytical chemist. From 1978 to 1983 he acted as chairman of the department of chemistry. Dr. Margerum visited the NSF in 1979 to see if he could raise funds for special projects and to see if and what grants were available. He stated that he "did make a case" with several of the people at the NSF that Dr. Fong's reconsideration should be given fair consideration. In turn, the NSF "went to some length" to explain the review process, but stated that Dr. Fong's proposal did not get enough favorable reviews for NSF to fund him. According to Margerum, the NSF had even sent out a second set of reviews which came back less favorable than the first. Several people supposedly recommended that Dr. Fong write a whole new proposal to meet the objections raised by the review committee. According to Dr. Margerum it was not unusual for the NSF to suggest that a proposal be rewritten, but Dr. Fong refused to follow the suggestion. He wanted the university to take action against the NSF and to assert that his proposal was not fairly reviewed. Because Dr. Margerum was convinced that the re-

view had been fair, he refused to take up Dr. Fong's cause against the NSF.

The witness added that the plaintiff had widely disseminated lies about him by writing to various colleagues in the field of chemistry and elsewhere. In response to Dr. Fong's allegation that Dr. Margerum, Provost Haas, and Dr. Clark met with him and offered him $45,000 to discontinue his attempt to obtain NSF funding, the witness stated that a meeting took place, but that no offers, promises or threats were made. According to Dr. Margerum, Dr. Fong did himself make a request for a large sum of money.

The witness stated that the plaintiff's lies and misrepresentations about him had been so often and so widespread that eventually, he would not speak to Dr. Fong without a witness present. Dr. Margerum testified that Dr. Fong had sent memos and letters about him to as many as 50 people at a time, and had spread lies about him both by these means and by phone calls. The witness stated that Dr. Fong's conduct made it impossible to both function as department head and to respond to continuous charges. Dr. Margerum, therefore, ignored the charges for the most part, responding as time allowed.

Dr. Margerum alleged that at one time Dr. Fong assaulted him both verbally and physically in response to the witness' refusal to meet a particular demand. In Dr. Margerum's words:

he came around the desk and ... pushed ... hard enough between a hit and a push and was threatening other action. And I stepped out of the office into the anteroom where he—where he repeated this type of physical and verbal assault to which there were then witnesses.

By Dr. Fong's account, the witness initiated the altercation.

On other occasions, Dr. Fong reportedly harassed Dr. Margerum and his family by repeated phone calls while he was department head. Regarding such conduct the witness testified:

He called my wife when I wasn't there. He also called my son when I wasn't there. And one time when he was trying to force me to take action, this was again with regard to the NSF, he threatened to wipe me out financially. He threatened me physical harm. And he did this through my son who was at that time 15 years of age. He—my son stopped answering the telephone because he kept calling back. And the tape recorder on the answering machine at our house—he used it by repeated calls until it was completely used up.

Dr. Margerum acknowledged that he was one of the professors from the chemistry department that had signed the petition to initiate censure and dismissal proceedings against Dr. Fong. In explaining why, the witness stated that the plaintiff had caused disruption for over a decade both within and without the university community, and that his "outlandish" conduct had caused visiting speakers to be reluctant to come to Purdue. In Dr. Margerum's view the plaintiff's conduct tended to consume an enormous amount of time in the department inasmuch as Dr. Fong demanded to be listened to not for minutes but for hours and days. The witness stressed that his decision to sign the petition was totally independent of Dr. Fong's scientific work. Dr. Margerum felt that the plaintiff had lied and elaborated upon lies so thoroughly, that perhaps he believed himself, and that, at any rate, his conduct had completely discredited him as a professor.

On cross-examination, Dr. Margerum acknowledged that despite Dr. Fong's conduct his own ability to get grant money had not been affected, nor had his research, nor had he been resultantly rejected for publication. Dr. Margerum admitted that he had urged Dr. Fong to write a new proposal to the NSF rather than to seek reconsideration. He denied knowing who made up the NSF review committee or why Dr. Fong's proposals were turned down. Dr. Margerum denied that the university offered $45,000 to Dr. Fong to not pursue reconsideration.

With respect to the "altercation" in Dr. Margerum's office, the witness placed the incident during a time when Dr. Fong had, in his view, failed to initiate a research

grant under which his own research students were to be paid. For this reason, Dr. Margerum was unwilling to discuss adding a Chinese scholar to the department. He did not recall being handed a piece of paper or refusing to return it. He did recall that the incident involved a request for a Chinese scholar to be added to the department, which he refused to consider. In closing his testimony, Dr. Margerum stated that he reported the incident to the police, and that he had no doubt in his mind that he had been physically assaulted.

Testifying in support of Dr. Fong was Dr. John Diestler, who came to Purdue in 1969, was tenured in 1972, and became a full professor in 1979. Dr. Diestler, like Frank Fong, is a physical chemist. The two men engaged in cooperative research several times in the past few years. According to Dr. Diestler, the plaintiff's research was of the highest caliber. He further testified that although he had seen Dr. Fong become angry, he had never seen him be violent.

Dr. Diestler described the field of photosynthesis as highly competitive, and the research and academic work of Dr. Fong as having potentially enormous impact. The witness described the chemistry department as being made up of about 45 people with ten or eleven of them being involved in the physical chemistry division. According to Dr. Diestler, Frank Fong at one time had one of the larger groups of research assistants, a fact which contributed directly to his ability to obtain funding, which in turn could be seen to affect standing in the academic community at large.

On cross-examination the witness acknowledged that he had received copies of letters containing Dr. Fong's allegations of criminal conduct on the part of government and Purdue officials.

Dr. Harvey Marshall, a sociology professor at Purdue, testified that as a member of the American Association of University Professors (AAUP) since 1969, and president of the Purdue chapter, he first became acquainted with Dr. Fong when the plaintiff contacted him about his plight in June of 1987. After an initial discussion of Dr. Fong's problems, Dr. Marshall received a call the Friday night before the plaintiff's dismissal hearings were to begin. The plaintiff informed Dr. Marshall that the dismissal committee was planning to go ahead with hearings despite the fact that Dr. Fong's attorneys had quit his case and he would not be represented. Dr. Marshall stated that he told the plaintiff that he would not, if he were in his position, attend the hearing without an attorney.

The witness indicated that one function of the AAUP is to enlist the help of an observer from another institution to evaluate the fairness of such proceedings. Dr. Marshall observed that academic freedom is an important value at Purdue. It is addressed in executive memorandum B 48, essentially as freedom to pursue any research interests that are of importance to him or her and within his or her expertise.

On cross-examination Dr. Marshall testified that in his opinion Purdue had followed a scrupulous procedure with respect to the conduct of the hearings up to the time when the hearing committee went ahead without Dr. Fong's presence. In response to this court's questioning, Dr. Marshall conceded that although academic freedom is broadly construed at Purdue, it would not be within its scope to falsely accuse someone of criminal conduct. In his opinion, however, it would be within the scope of the policy to make such accusations if one believed them to be true. According to Dr. Marshall, executive memorandum B 48 would be seen to comply with the standards and procedures recommended by the AAUP. On re-cross the witness acknowledged that a letter from the AAUP in Washington, D.C. which was dated January 7, 1988, and carboned to him, had indicated that the AAUP was unaware of any procedural irregularities in the processing of Dr. Fong's case. Based on an assumption that this statement was made after the committee proceeded without Dr. Fong present, the witness disagreed with the AAUP's point of view.

Walter Valentine, Special Agent with the Federal Bureau of Investigation (F.B.I.), first met Frank Fong in the early 1980's.

In 1983, Dr. Fong requested a meeting with Agent Valentine at which he discussed, in general terms, a fraud of federal grant money emanating from the NSF. The witness warned the plaintiff that if he wished to make such an allegation, it should formally be done soon, because otherwise the statute of limitations would run. Dr. Fong did not contact Agent Valentine within the advised time period.

In September of 1986, Agent Valentine asked to see Dr. Fong concerning a bank fraud which was being investigated by the FBI. One of the bank's loans had been made to Dr. Fong. Having lost over $400,-000 on the loan, the bank had written the amount off for tax purposes. In the course of discussing this matter with Dr. Fong, the plaintiff produced 19 tape recordings relating to that investigation, which were characterized by Fong as containing confessions of wrongdoing by various attorneys, certified public accountants, bankers and internal revenue agents. In January of 1987, having reviewed the tapes, Agent Valentine told Dr. Fong that there was absolutely nothing on the tapes in the nature of confessions. The tapes did contain phone calls to various bankers, lawyers, and CPA's which Agent Valentine viewed as being of an harassing nature on Dr. Fong's part.

Agent Valentine also testified that he had received "innumerable phone calls, as many as three a day" on the subject of Dr. Fong's accusations against the NSF and university officials. On at least a dozen occasions in a period of about 15 months, Agent Valentine informed the plaintiff that he found no indications of a crime having been committed, especially one that would be a matter for F.B.I. investigation.

After receiving countless phone calls from Dr. Fong, Agent Valentine eventually informed the plaintiff that he could no longer allow him to take up his time, that he had his rights too, and that he considered Dr. Fong to be harassing him. Agent Valentine advised the plaintiff that if he had further complaints to take them up with his Indianapolis supervisor, Henry McInturff. The witness recalled these events out of a twenty-three-year career with the FBI.

Dr. Kenneth Kliewer, Dean of the School of Science at Purdue, testified that he first met the plaintiff at the October 8, 1986 meeting with Dr. Beering and others. When asked if at that meeting President Beering had issued a directive to him, Dr. Tyler, and Dr. Pardue to perform the terms of the "contract" with Dr. Fong, the witness testified that Dr. Fong's statement to that effect was false. Dr. Kliewer recalled that the October meeting ended with Dr. Fong threatening Dr. Tyler. Nonetheless Dr. Kliewer wrote to NSF to verify that any proposals submitted by Dr. Fong would be reviewed objectively. Dr. Fong reportedly dismissed NSF's affirmative response as meaningless.

Dr. Kliewer indicated that Dr. Fong had repeatedly harassed him and his family with phone calls, once informing Dr. Kliewer's wife, at 10:55 p.m. of an intention to destroy Dr. Kliewer's career. The witness also described a "blizzard of calls", which were "ferocious" and "intimidating" in tone, with the invariable theme of money being owed to Fong. The witness estimated the calls to have been about twenty in number, beginning from 8:45 p.m. and ending at 4:05 a.m.

On June 19, 1987, Dr. Kliewer met with Dr. Fong for an informal discussion of the prevailing problems. The witness later learned that Dr. Fong had a tape recorder concealed on his person during the meeting. Dr. Kliewer recalled that Dr. Fong would ask the same question of him a number of times and then would ask him to repeat his answers. When Dr. Kliewer learned of the hidden tape recorder, he became angry, especially since it had been agreed that the conversation could be recorded.

Dr. Kliewer testified that Dr. Fong had accused him of criminal conduct in correspondences that were copied, at least on their face, to Governor Robert Orr and Senator Richard Lugar, and that were sent to the Purdue Board of Trustees. The witness further referred to charges against a vast array of others, indicating that Dr.

Fong showed no signs of discontinuing his disruptions. In Dr. Kliewer's opinion, "the negative effects associated with the antics of the last decade are real, palpable and, ... within the chemistry element ... ubiquitous."

On cross-examination, Dr. Kliewer denied having any particular sensitivity to Dr. Fong's being Chinese, although he had so referred to him in the administrative hearings. The witness admitted that he considered Dr. Fong "a scoundrel." Dr. Kliewer acknowledged that he had recommended that President Beering not provide the plaintiff with a list of conditions to avoid a hearing, rather that procedures for censure and dismissal be forthwith initiated, as a consequence of having met with Dr. Fong to no avail.

Dr. Harry Pardue, a Professor of Chemistry at Purdue, acted as the head of the chemistry department from July 1, 1983 through June 30, 1987. He testified that he is familiar with procedures for applying for grants, for example, from the National Science Foundation. The witness admitted being one of the professors who had signed the petition to remove Dr. Fong from the department, stating that he based his decision on the plaintiff's harassing telephone calls, some made to him personally, as well as on his widespread accusations of criminal conduct, some directed at him personally. According to Dr. Pardue, the university had attempted to work with Dr. Fong for many years, and the plaintiff had been advised on several occasions to go through proper channels to address his perceived grievances. Dr. Pardue testified that he had contacted Dr. Findeis of the NSF, and that the two of them had meant to be helpful in advising that Fong submit a formal proposal. In Dr. Pardue's opinion, the plaintiff's conduct had dealt a strong blow to the morale of the chemistry department, and caused concern that people may believe his accusations.

On cross-examination, Dr. Pardue stated that Dr. Fong had lately stepped up the intensity of his accusations as well as the scope. Dr. Pardue reiterated that prior to initiating the proceedings, the university had attempted to work out the problems with Dr. Fong. He pointed to Dr. Fong's charges, his misstatement of facts, and his harassment and intimidation as being the primary, but not the exclusive grounds for initiating the proceedings. To the best of the witness' knowledge, no one had resigned from the chemistry department due to the plaintiff's conduct.

In reference to the hotly disputed meeting of October, 1986, the alleged tape tampering and the alleged discussion of Dr. Fong's "August 1984 agreement", the witness, who was there present, denied hearing any of the discussion alleged by Dr. Fong.

Dr. Varro Tyler, Executive Vice President for Academic Affairs at Purdue, described preparation of the petition to initiate censure and dismissal proceedings against Dr. Fong, stating that the charges against the plaintiff are true to the best of his knowledge. Dr. Tyler also stated that he and several others had jointly put together the charges which were formalized with the assistance of the university attorney.

In reference to Dr. Fong's allegation that President Beering had directed performance of the university's "contract" with the plaintiff, Dr. Tyler stated that the allegation was "a lie." He also stated that he had personally been threatened or harassed by Dr. Fong, once at the conclusion of the October 8th meeting. Dr. Tyler described this incident as follows: "He came over to me and he towered above me and said, 'I will get you for what you said.' And I looked up at him, and I said, 'is that a threat.' He said, 'yes, that is a threat.'" According to Dr. Tyler, the plaintiff then called his office the next morning to remind him that he had been threatened, whereupon Tyler made a report to the Purdue police. Dr. Tyler testified further that at the February 15, 1988 censure and dismissal hearing, Dr. Fong threatened to have the witness fired, and threatened to have the university's attorney disbarred.

In describing his motivation in going forward with the censure and dismissal proceedings, Dr. Tyler stated that upon receiv-

ing a petition signed by 30 full professors of chemistry which stated that the plaintiff represented an undesirable colleague, he felt that there was no alternative but to put together the charges. The witness testified that his action had nothing to do with academic freedom in his opinion. Dr. Tyler indicated that his experience with complaints about Professor Fong had extended over years, and he felt the time had come, upon receipt of the petition, to do something about the situation. The witness testified that upon the request of members of the committee by way of Dr. Wayne Perry, the committee chairman, he had asked that security police be present at the university hearing.[2] In Dr. Tyler's estimation, the censure and dismissal proceedings will cost the university in the neighborhood of $100,-000.00 without attorney fees. As a final matter, Dr. Tyler, having read the transcript of the October, 1986 meeting, recalled the events as corresponding therewith.

## I.

### THE PROCEDURAL DUE PROCESS CLAIM

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth,* 408 U.S. 564, 568, 92 S.Ct. 2701, 2704, 33 L.Ed. 2d 548 (1971). Where there are protected interests at stake, there is a right to some kind of prior hearing. *Id.* at 570, 92 S.Ct. at 2705. Protected property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* at 577, 92 S.Ct. at 2709.

■ Not all employment will involve a protected property interest. The law is clear, for example, that there exists no statutory authority which accords due process rights to probationary employees. *See, e.g., Davis v. City of Chicago,* 841 F.2d 186 (7th Cir.1988). In this case there is no question that Dr. Fong has a Fourteenth Amendment property right in his job. That right is created in his tenure

contract with the university. *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 416 (7th Cir.1988). As a tenured teacher the plaintiff can be fired only for cause. *Button v. Harden,* 814 F.2d 382 (7th Cir.1987).

■ With respect to the plaintiff's liberty interests, a public employer is prohibited from firing an employee, "on publicly stated grounds that are stigmatizing, without providing due process of law". *Yatvin* at 417, citing *Colaizzi v. Walker,* 812 F.2d 304, 307 (7th Cir.1987) and *Jungels v. Pierce,* 825 F.2d 1127, 1131 (7th Cir.1987).

■ These protections do not extend to harassment of employers nor to the commission of torts against employers by employees. *See, Yatvin,* 840 F.2d at 418. Indeed, if an employee's charges are truly baseless, "the employee's action in filing them may itself be a form of misconduct justifying disciplinary measures not rightly deemed retaliatory." *Id.,* citing *Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1182 (7th Cir.1982). The above cases indicate clearly that an employee's liberty and property interests, in the context of the leveling of any and every form of accusation against an employer, will range from limited to unprotected. In any event, on these facts, there can be no question that the plaintiff was afforded more than adequate protections in terms of procedural due process.

On September 15, 1987, Dr. Fong was given notice of the charges against him, which notice is marked as Appendix "A" and incorporated herein by reference. On November 13, 1987, two firms of attorneys that were then representing the plaintiff were provided with a further elaboration of these charges which is marked as Appendix "B" and incorporated herein. No claim is here made that the plaintiff was not fully apprised of the nature of the charges against him, for indeed none could be made.

By a letter dated September 15, 1987, Dr. Tyler notified Professor Tilton W. Perry, Chairman of the Faculty Committee on Censure and Dismissal Proceedings, of the

charges preferred against Dr. Fong. Dr. Tyler requested that Perry convene the Faculty Committee on Censure and Dismissal Proceedings to consider the charges, determine their validity, and make a recommendation to the President. Soon thereafter, that Committee advised the plaintiff that a hearing would be conducted on November 7–8, 1987, to consider the charges.

On October 6, 1987, a representative of two different firms of attorneys, one in Lafayette, Indiana, and one in Carmel, Indiana, advised the Committee of their representation of the plaintiff in connection with these proceedings. The attorneys for the plaintiff also asked for and received a continuance of the November 7–8, 1987, hearing date which was accordingly reset for December 12–13, 1987. On December 3, 1987, the attorneys acting for the plaintiff filed an answer denying each of the eight charges against the plaintiff.

On December 12, 1987, the plaintiff appeared in person before the Faculty Committee without his attorney present. The plaintiff requested that the hearing be continued and then read from a text prepared by his attorneys. The plaintiff stated that in the event the Faculty Committee refused to further postpone the hearing, he would request on the advice of his counsel that all evidence taken be recorded by the stenographer. Dr. Fong further reserved his rights to give opening statements and recall witnesses until such time that he could present his own evidence with counsel present. That message was also written by one of his counsel.

The continuance was granted in part under the terms the plaintiff had outlined. It was agreed that at a mutually convenient time as soon after February 1, 1988, as possible, the Committee would reconvene with the plaintiff and his newly employed counsel present. However, the Committee indicated an intention to proceed on that day, December 12, 1987, and to invite the University to proceed to put on its case, with the understanding that the entire proceedings were not only being tape recorded, but would also be transcribed by a qualified court reporter. Moreover, counsel for the plaintiff would thereafter have an opportunity to review the proceedings that took place on December 12. With these understandings the session was reconvened. When the decision to proceed was announced, Dr. Fong excused himself from the hearing, stating that he did so on the advice of counsel. The Committee strongly urged the plaintiff not to excuse himself, but he chose to leave anyway. Plaintiff also indicated that he was certain that he would be prepared and ready to proceed when the committee reconvened in February, 1988.

On or about December 15, 1987, the plaintiff was advised that the Committee would reconvene on February 15, 1988. On or about January 29, 1988, the plaintiff was advised by letter from Executive Vice-President Tyler that a transcript of the December 12–13, 1987, proceedings would be made available to the plaintiff at the University's expense. The plaintiff's counsel was subsequently provided with a complete copy of the transcript of proceedings before the Faculty Committee. Prior to reconvening the hearing panel on February 15, 1988, the plaintiff contacted members of the hearing panel, causing some of them to request of the Committee Chair that extra security be provided at the hearing because of expressed concern about their personal safety. At the committee's request, three plain clothes police officers were present for security purposes at the next session (As indicated in footnote two, this subject has continued in post hearing filings).

The Committee reconvened on February 15, 1988. The plaintiff appeared in person with Attorney J. Paige Clousson. At the outset, Attorney Clousson requested that the Committee disqualify itself because it had heard evidence in the hearings conducted on December 12 and 13, 1987. The Committee refused to disqualify itself, and Attorney Clousson then requested a continuance because he was not prepared to go forward. Clousson assumed that if a continuance were granted, he could be ready to go forward in sixty days. Mr. Clousson made a hard and definite promise to be so prepared. The Committee granted a con-

tinuance of the hearing until April 11, 1988, at which time proceedings reconvened and were ultimately completed on April 26, 1988.

During the course of the completion of the proceedings, all witnesses that had testified on December 12 and 13, save one professor from the Chemistry Department who was out of the country, were made available for cross examination by the plaintiff's counsel. It must be emphasized that no assertion is made here that any deliberate or intentional effort was made to secrete Professor Morrison by sending him out of the country. In keeping with the dimension of the problem is the fact that even in criminal proceedings, which this is not, the whole implementation of the confrontation clause of the Sixth Amendment is not always advanced in a puristic fashion. Here, a single professor in the plaintiff's department was out of the country at the time of the hearing. With reference to all the other witnesses, the plaintiff and his counsel were given the full right to confront and cross examine and they exercised same. It should also be emphasized that on December 12, 1987, plaintiff was given an opportunity to object to the Faculty Committee's composition and at that time approved the same.

■ This court admitted the entirety of the transcript of proceedings before the Faculty Committee, as well as all of the documentary and physical proof that was before it. Such is massive. The court's action invoked an objection from counsel for the plaintiff as to whether the documents put before the Committee, which were not formally introduced in the trial of this case, would be considered for the truth of any question. The entire transcript and proceedings were introduced so that the court could know the full dimensions of what actually happened as the Committee functioned. It is difficult to conceive how a procedural due process claim could be decided without precisely understanding what process took place. It is primarily for that reason that these proceedings were admitted here, as bulky and burdensome as they were. It should also be emphasized

that in large measure, the significant documents that were before the Committee have also been formally introduced into evidence before this court. The court wishes to make it clear, however, that in making determinations of fact in this case, it will not rely on documents and evidence that were not presented to this court. The exception to this must be the determination of whether it was in fact procedural due process. The court has every right to look at the entire record to determine this issue and has done so.

The record clearly discloses that plaintiff's counsel was given a very large latitude in cross examining witnesses and in opinion testimony. The basic underlying guidance for the Committee was Executive Memorandum B–48 which is marked as Appendix "C" and incorporated herein by reference. In addition, there was an observer present during the proceedings conducted from April 11 through April 18, 1988, from the American Association of University Professors (AAUP).

■ As indicated above, Dr. Fong was a tenured professor at Purdue University and that status cannot be terminated without complying with a species of procedural due process. It is clear that the plaintiff's status as a tenured professor does give him the necessary interest to require procedural due process, whether one labels such interest as one of property or liberty. *See Bd. of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), in dealing with the question of a predetermination hearing for public employees, the Supreme Court held that procedural due process does demand a hearing. The essential ingredients of the same were notice and an opportunity to respond. The opportunity to respond included the opportunity to present reasons in person or in writing as to why a proposed action should not be taken. Moreover, a tenured public employee was found to be entitled to oral or written notice of the charges

against that employee, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Id.*

There is not a single case authority known to this court and none has been cited by this plaintiff, that suggests that this particular brand of procedural due process requires the incorporation by reference of both the Federal Rules of Evidence (particularly, the hearsay rules in Rules 801–804), and the Federal Rules of Civil Procedure (particularly, the discovery rules under Rules 26 through 37). In a case predating *Loudermill,* the Seventh Circuit held that a university president was entitled to receive notice of the charges against him, notice of the evidence upon which the charges would be based, a hearing before a tribunal possessing apparent impartiality, and a chance to present witnesses and confront adverse evidence at that hearing. *Hostrop v. Bd. of Junior College Dist. No. 515,* 471 F.2d 488 (7th Cir.1972).

In an interesting and relevant case in a neighboring circuit, *Crook v. Baker,* 813 F.2d 88 (6th Cir.1987), the court held that a letter from the university department which outlined the charges, was adequate notice in those circumstances. The court added that the adequacy of the notice was enhanced by the fact that a subsequent and more complete statement of the charge, together with supporting documents, were supplied. Here, the record is clear that the person in question understood the charges against him because he filed an answer to them and thereafter had an opportunity to present witnesses and cross examine the university's witnesses.

In *Crook,* not here, Crook's attorneys were not permitted to question any witnesses, although he was allowed to advise Crook on this subject. This was held in the Sixth Circuit not to deprive Crook of procedural due process. A wide variety of settings will permit a variety of process. One example, which will suffice, is in the area of internal prison disciplinary proceedings, as outlined in *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and *Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974).

This court has been invited to bottom a decision on the concept of unclean hands on the basis of the most recent decision on that subject by Chief Judge Bauer, in *Beermart, Inc. v. Stroh Brewing Company,* 804 F.2d 409 (7th Cir.1986). Certainly, there is some authority that this concept of unclean hands may be applied in a First Amendment context. The reasoning and result of *Shondel v. McDermott,* 775 F.2d 859 (7th Cir.1985), causes this court some considerable hesitation. Therefore, in this specific area dealing with the procedural due process claim, the court will not bottom its decision on the concept of unclean hands. When all is said and done, considering, as the court must, the entire length and breadth of the proceedings before the Committee, as well as the many relevant authorities, an abundance of procedural due process was had, and it is hard to visualize how more could have been reasonably provided. Therefore, on the basis of the record before it, the claims based on failure of procedural due process are without merit.

## II.

### THE FIRST AMENDMENT CLAIM

The First Amendment of the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The law has been clear, at least since 1968, that government employees cannot prohibit public employees from exercising their right to engage in speech that is protected by the First Amendment of the United States Constitution. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Conner v. Reinhard,* 847 F.2d 384 (7th Cir.1988). Contained within this principle of law, however, are a number of conditions, refine-

ments and sub-issues that must be factored into a determination of whether such an employee's constitutional rights have actually been violated. One of these determinations is whether the employee's speech is "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

This principle is echoed in the Supreme Court's more recent pronouncement on free speech, namely, *Rankin v. McPherson*, — U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Simply put, *Rankin* is an example of a species of pure free speech that, however offensive, does not in any way affect the employment environment and is basically unrelated thereto. In that manner, and in general, *Rankin* is of little relevance, other than its emphasis on determining the "public" nature of speech by content, form, and context within the framework of the record as a whole. *Rankin* at 2897.

The question in context here relates to academic freedom in a state university. An early and significant statement of the First Amendment dimensions of so-called academic freedom is found in *Clark v. Holmes*, 474 F.2d 928 (7th Cir.1982). A panel in that case included Judge, now Justice Stevens and the late Judge Luther M. Swygert, then the Chief Judge, whose commitment to the most liberal reading of the First Amendment is legend in this circuit and district. That court stated:

> Clark's claim of error fails for two reasons. First, Clark construes too broadly the extent of his First Amendment rights and thus slights the interest of the State in providing its educational services according to policies it deems proper. Clark would have us drastically and radically curtail the scope of discretion which may be exercised by a state school in deciding whom it shall rehire. Second, Clark ignores the factual differences between his case and a case like *Pickering*. His disputes with his superiors and colleagues about course content and counselling were not "matters of public concern" and involved Clark as a teacher rather than as an interested citizen. *Compare also Perry v. Sindermann*, 408 U.S. 593, 595, 598, 92 S.Ct.

2694, [2696, 2698] 33 L.Ed.2d 570 (1972); *Donahue v. Staunton*, 471 F.2d 475 (7th Cir.1972). Further, Clark has cited no sound authority for his proposition that he had a constitutional right to override the wishes and judgment of his superiors and fellow faculty members as to the proper content of the required health course and the inadvisability of engaging in extensive personal counselling of students, two of the three matters about which most of the defendants were particularly concerned.

> The same reasoning applies to Clark's criticisms of NIU's administration and faculty in front of students. We think the district court correctly decided that this conduct also was not protected by the First Amendment. *Pickering*, which guards a public school teacher's right to speak out publicly on issues of public concern, is factually distinguishable from the present case. However, we do recognize that, although academic freedom is not one of the enumerated rights of the First Amendment, *Parducci v. Rutland*, 316 F.Supp. 352, 355 (M.D.Ala.1970), it is now clear that academic freedom, the preservation of the classroom as a "market place of ideas," is one of the safeguarded rights. *Healy v. James*, 408 U.S. 169, 180–181, 92 S.Ct. 2338, [2346] 33 L.Ed.2d 266 (1972). But we do not conceive academic freedom to be a license for uncontrolled expression at variance with established curricular contents and internally destructive of the proper functioning of the institution. First Amendment rights must be applied in light of the special characteristics of the environment in the particular case. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, [736] 21 L.Ed.2d 731 (1969); *Healy, supra*. The plaintiff here irresponsibly made captious remarks to a captive audience, one, moreover, that was composed of students who were dependent on him for grades and recommendations. *See Ferguson v. Thomas*, 430 F.2d 852, 858 (7th Cir.1970).

*Clark* at 931.

Also relevant to this case is the teaching of *Garrison v. State of Louisiana*, 379

U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), a unanimous opinion authored by Justice Brennan, one of contemporary judicial history's most liberal readers of the First Amendment. The case involved a conviction under a Louisiana statute for criminal defamation. It held that the criminal libel statute incorporated constitutionally invalid standards, in the context of criticizing the conduct of public officials, by directing punishment for true statements made with actual malice. The Supreme Court held that the statute was also unconstitutional in directing punishment for false statements against public officials made with "ill will", but without consideration being given to whether such statements were made with knowledge of falsity, reckless disregard of truth or falsity, or reasonable belief in the truth of the statements. In reaching that result, Justice Brennan stated:

> The use of calculated falsehood, however, would put a different case on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col.L.Rev. 1085, 1088–1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *" *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.

*Garrison* at 75, 85 S.Ct. at 216.

During the course of this trial, the plaintiff's counsel made a proffer at one point with regard to a transcript of a telephone conversation between the plaintiff and Assistant United States Attorney John Hoehner. This court expressed its considerable consternation in regard to this plaintiff's practice of surreptitiously recording a telephone conversation with an assistant United States attorney. Apparently, this court's disdain for that practice is shared in other very respectable quarters. *See* the comment of Judge Eschbach in *Egger v. Phillips*, 710 F.2d 292. Although one-way surreptitious recording of telephone conversations is acceptable law enforcement practice, *see, United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), it remains this court's view that the extent to which this record is replete with the recording of conversations and meetings, is a matter that demeans the educational process. Moreover, here, as in *Egger*, the practice raises serious questions about the motives and purposes of the recorder.

Judge Eschbach's massive opinion for the *en banc* court in *Egger* is also instructive, when viewed in light of a substantial factual difference between the Federal Bureau of Investigation Office in Indianapolis and the educational setting of Purdue University in Lafayette, Indiana. It is further to be noted that the lynchpin of the final decision in *Egger* is immunity provided for in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). All of that which is stated in Judge Eschbach's analysis of free speech and the so-called *Pickering* calculus is most helpful here.

■ It was certainly recognized in *Egger* that protection under the First Amendment does not depend on the "social worth" of a

particular statement. It is necessary to examine the content of the speech in question. In that case, the *en banc* court held that Egger's communications, in some respects, involved matters of public policy and concern and in other respects implicated institutional matters. Judge Eschbach labeled this phenomenon as "dual character." Egger had charged that a fellow agent, Naum, had committed perjury and was accepting bribes. Certainly, that charge might implicate Egger's interest as a concerned citizen. Nevertheless, the personal nature of the accusation is also relevant. Criticism directed against a fellow employee, even if it raises issues of general concern, necessarily implicates different interests of the state as employer, than would an impersonal criticism of the institution generally. Egger's core allegations against Naum involved matters of both public and internal concern, by virtue of having grown out of a dispute in which the complainant was personally involved. In this case, the plaintiff is given the benefit of the doubt that some part of his speech was on an issue of general public concern, even though the major portion of it was egocentric. For a case where this doubt tilted the other way, see *Vukadinovich v. Bartels*, 853 F.2d 1387 (7th Cir.1988).

This court is all too familiar with the liberality that pervades conspiracy law as it works its way out in criminal prosecutions in a United States District Court. Nonetheless, it is this court's view that all concerned can still profit from the classic concurring opinion of Justice Robert Jackson, in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). At the other end of the spectrum from the Jackson opinion is the opinion of the present Chief Justice slightly over a year ago, in *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), which substantially liberalized the standards and methods of proof for criminal conspiracies in United States district courts. Having said all of that, and understanding the current dimensions of criminal conspiracy law, the court notes that throughout this record are woven allegations of such a criminal conspiracy which would involve: high officials of the National Science Foundation; high officials at Purdue University; Professors Calvin and Pimentel at the University of California at Berkeley; the Agent In Charge and other agents of the Federal Bureau of Investigation in both Indianapolis and Lafayette, Indiana; officers of the Indiana State Police; persons in the Tippecanoe County Prosecutor's Office, including the prosecutor himself; Governor Robert Orr; and at least one, if not more, Assistant United States Attorney for this district. The blunt and undisputed fact apparent in this record is that there is no objective evidence to prove such a conspiracy, either beyond a reasonable doubt, or by a preponderance of the evidence.

By analogy to the standards of proof that prevail in so-called civil RICO actions, with which this court has more than passing familiarity, *see, Ashland Oil, Inc. v. Arnett*, 656 F.Supp. 950 (N.D.Ind.1987), there would be no possible basis on which a conspiracy theory could be submitted to any jury, even on the basis of the standard of preponderance of the evidence. The proof of such a widespread and far reaching conspiracy is a figment of the fertile and sometimes distorted imagination of the plaintiff.

In regard to the issue of malice, the plaintiff by his own words has revealed the presence of a "smoking gun." That smoking gun is found in defendant's Exhibit 74 at page 3, where he states:

"I began to realize that the suffering that I inflicted on others might have been even worse than my own because they saw neither beauty nor truth, but only my madness. They sought to confine this madness by appealing to the sense of decency and common reason in me, and were dismayed to find that I apparently cared for neither."

A careful study of this exhibit in its entirety no doubt could provide a number of significant professional insights into the personality and psychological make-up of this plaintiff. In explaining the content of this communication, Dr. Fong attributed to himself a type of "mid-life crisis" at that

time, during which he had sought, borrowing from the writings of Henry Miller, to draw parallels between the growth of a creative writer and a creative scientist. In any event, the words chosen by the plaintiff clearly suggest a rather alarming attitude of hostility and vengeance.

Relevant to the issue of the plaintiff's credibility is Plaintiff's Exhibit 5, which is a letter from the plaintiff to Assistant United States Attorney, Christina McKee, dated June 2, 1987. Among other things, it states: "I was informed by the F.B.I. ... that federal and state statutes were violated." The testimony of Special Agent Walter Valentine of the F.B.I. categorically contradicts the aforesaid statement. This court saw, heard, and credits Agent Valentine's testimony. There is no objective basis in this record for the plaintiff to have stated that the F.B.I. had informed him that federal and state statutes were violated. Two letters from William C. Ervin, Agent in Charge of the F.B.I. at Indianapolis, which are dated June 23, 1987, and July 20, 1987, are categorical proof supporting this conclusion. The July 20, 1987, letter is worthy of quotation in full:

Dear Professor Fong:

This is in response to your letter of June 30, 1987, to me, and your letters of July 2, 1987, and July 8, 1987, to Special Agent Gary O. Schoon in which you expressed your displeasure with the contents of my letter of June 23, 1987, and your desire to have it changed.

The intent of my letter of June 23, 1987, was to correct what we consider a misunderstanding on your part of the Federal Bureau of Investigation's position concerning your complaint of an alleged funding scheme by the National Science Foundation (NSF) and others. What led to my letter of June 23, 1987, was your spreading of incorrect information. It has been brought to my attention that you were telling the organizations mentioned in my letter of June 23 that as a result of your meeting of May 4, 1987, with Supervisory Special Agent (SSA) Henry McInturff and Special Agent (SA) Joe Hoffman of the FBI that you were informed that indictable crimes

had been committed. That is a misunderstanding on your part. The truth is that, after a review of your complaint against the NSF and others, it was determined that your complaint contained no Federal violation within the investigative jurisdiction of the FBI. We looked into the possibility of such, but none was discovered.

There was no intention on behalf of the Agents of the FBI to obstruct any official proceeding you may have with any organization, nor was there any obstruction.

As for the part of my letter concerning whether you may have taped the May 4, 1987, meeting with SSA McInturff and SA Hoffmann, information came to my attention indicating that possibility, and I desired to so inform you.

I regret any misunderstanding which may have occurred; however, our position still stands that we cannot be of assistance to you in your complaint about the NSF and others, inasmuch as a thorough review of the matter has determined that there is no Federal violation within the investigative jurisdiction of the FBI.

Very truly yours,
William C. Ervin
Special Agent in Charge

In addition, it appears from this letter, that the plaintiff was again surreptitiously recording a meeting, this time with Supervisor Henry McInturff and Special Agent Hoffman of the F.B.I., even though the plaintiff had indicated that such was not the case. The precise authority for this is contained in the June 23, 1987, letter from Ervin to the plaintiff.

In addition, the plaintiff by a letter dated July 7, 1987, to the United States Attorney for this district, State Representative Stan Jones, United States Senator Richard Lugar, Governor Robert Orr, the United States Representatives John Myers and Phillip Sharp, accused Assistant United States Attorney McKee, of obstruction of justice, a federal crime under 18 U.S.C. § 1510, and accused F.B.I. Agent in Charge

Ervin of deception and fraud. Plaintiff further says that Ervin and Beering conspired against him, and that the plaintiff had "been advised by the Indiana State Police that the state investigators were prepared to file charges against Dr. Beering, et al. for obstruction of justice."

In this regard, the court heard and saw the testimony of long time state police officer, George Ross, who described himself modestly as a "street cop." Whatever his self-description, state police officer Ross testified carefully and credibly. His testimony fully and completely contradicted any basis that the plaintiff might have to suggest that the Indiana State Police Department was about to file charges against the president of Purdue University for obstruction of justice. This court specifically credits the testimony of Officer Ross.

In addition to false allegations directed at a wide array of people with reference to criminal conduct, this plaintiff has also made threats or veiled threats of physical violence. This is certainly the construction that this court puts on Defendant's Exhibit K–3, which is a letter from the plaintiff to the Dean of Science, Kliewer, dated April 10, 1987. The following sentence appears: "Unless you respond to this memo, this damage may end up hurting you personally, as well as many others." This and other examples of threatening language were a reasonable cause for concern on the part of Purdue officials. The testimony of Drs. Kliewer, Beering, Margerum, and others indicated that threat of financial ruin was also a method of intimidation frequently chosen by Dr. Fong.

There are a number of most distressing aspects contained in the factual record in this case. One of these is Professor Fong's emerging habit of taping telephone calls, personal conversations and meetings. This practice quickly merges into disputes as to the accuracy of proffered transcripts thereof.

This plaintiff has gone to great lengths to challenge the content and accuracy of a meeting with President Beering and others. President Beering testified, in fact, that the disputed tape was not a full transcript of that meeting. Later in the trial this plaintiff selectively taped, transcribed and offered other transcripts of telephone conversations.

Although permissible in a criminal law enforcement context, the practice of taping telephone conversations unbeknownst to the other conversant is, to paraphrase Justice Holmes in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) "dirty business." Certainly it is undesirable business at best. It is particularly distressing to know that a telephone conversation between an assistant United States Attorney and this plaintiff was taped without knowledge of the former participant therein.

The grim reality of this taping drama is that in the management of a great university, taping tends to beget taping, and the whole process demeans educational purposes and sidetracts the same into totally irrelevant byways. In effect, the subject of taping and the accuracy of partial transcripts is largely a red herring here, adding little to the substantive issues involved. At most it sheds additional light on the credibility and *modus operandi* of this plaintiff and the reactions of others to his conduct.

Examples of non-protected speech are also replete in this record. For example, Dr. Fong specifically alleged that the President of Purdue University, Dr. Beering, was guilty of "a heinous crime." The definition of heinous in the *New World Dictionary of the American Language* is "outrageously evil or wicked; abominable". It cannot be doubted here that a person as adroit and experienced in the use of the English language as Dr. Fong could have used the term "heinous" to mean other than what the dictionary indicated. This is certainly not protected free speech under the First Amendment. In *Garrison, supra*, even Justice Brennan, the most liberal contemporary reader of that Amendment, has said no less.

It is correct that a number of the subjects about which Dr. Fong has exercised his free speech rights are of public concern. This is particularly true in regard to the practices and policies of the National Sci-

ence Foundation. Doctor Fong has in fact freely exercised at the state, federal and local levels, that part of the First Amendment which entitles him and other citizens to petition the officials in their government. Again, the emphasis, however, was not on questions of larger policy, but on particularized matters that directly concerned Dr. Fong in a personal way. These observations are not intended to depreciate the important values of free speech, which in modern times, are symbolized by the opinion of Chief Justice Hughes in *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

■ Very large slices of Dr. Fong's exercise of free speech rights are totally unprotected by First Amendment guarantees. Again, the authority for that conclusion is no less than Justice Brennan speaking in *Garrison*. Dr. Fong accuses high administrative and academic officials at Purdue University of serious criminal conduct which goes beyond the pale of protected free speech. Indeed under the substantive law of Indiana dealing with defamation, such accusations are considered defamation *per se*. *See, e.g., Gibson v. Kincaid*, 140 Ind.App. 186, 221 N.E.2d 834 (1966). Even under the constitutionalized limitations on defamation of public officials, as in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), there is abundant evidence in this record to demonstrate to any trier of fact that these false allegations were made with actual malice.

■ The circumstances here substantially contrast with those found by this court in *Fadell v. Minneapolis Star*, 425 F.Supp. 1075 (N.D.Ind.1976), *aff'd*, 557 F.2d 107 (7th Cir.1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977). Doctor Fong accused the governor of the state of Indiana, and longtime officials and officers of the Indiana State Police with being involved in criminal conduct. Fong again made statements that are outside the proper protection of the First Amendment as above described. Doctor Fong accused the local prosecuting attorney of being involved in criminal conduct. He again transgressed the protected boundaries of free speech as embedded in the First Amendment. Doctor Fong accused the agent in charge of the F.B.I. in Indiana, along with the senior agent in the Lafayette office, Walter Valentine, as well as Assistant United States Attorney, Christina McKee, of being involved in criminal conduct. Doctor Fong went well beyond the protections that are afforded free speech.

■ It is true that Purdue University cannot discharge Dr. Fong for the exercise of First Amendment rights which are protected. It can, however, and perhaps should take into consideration his conduct in making serious charges of criminal conduct of a wide array of highly placed educational, governmental, and law enforcement officials without any objective basis for doing so. It is one thing to disagree with a prosecuting attorney or a United States attorney with reference to the latter's exercise of judgment in terms of prosecuting someone for a criminal offense. It is elementary that the exercise of such prosecutorial authority by state and federal prosecutors is perhaps the most important function of that office. It is, however, a vastly different thing to base one's disagreement with those prosecutorial decisions on an accusation of involvement in criminal conduct. Such is precisely what has occurred here.

As indicated earlier in this opinion, the determination of whether statements constitute speech on a matter of public concern, the same must be determined by the content form and context of a given statement as revealed by the whole record. *Rankin, supra*. The elements to be considered are (1) whether the speech at issue impedes the state's ability to perform its duties efficiently, (2) the manner, time and place of the speech; and (3) the context within which the speech was made.

■ State interests weigh heavily where an employee's speech thwarts the mission of the agency or impedes the performance of the speaker's duties. Where an employee's speech has a detrimental impact on close working relationships or destroys harmony among co-workers, a wide degree of deference to the employer's

judgment is appropriate. See *Morales v. Stierheim*, 848 F.2d 1145 (11th Cir.1988).

Here, without doubt, the bulk of Dr. Fong's "speech" was unprotected, that which was arguably protected was largely egocentric and, in the final analysis, the plaintiff's conduct provided a multitude of reasons for initiating censure and dismissal proceedings outside any that were remotely associated with First Amendment rights.

## III.

### CONCLUSION

██ In regard to the procedural due process claim in this case, this court's focus must be not on whether the officials at Purdue University have acted wisely, but on whether they have acted within the boundaries of procedural due process, a fairly simple and straightforward concept, which, at its bare essentials, involves a question of basic and fundamental fairness. *Compare, International Shoe v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Purdue University is not required to provide a perfect procedure, only a fundamentally fair one. The procedures outlined on the face of B–48 are clearly and without dispute within the outer perimeters of procedural due process. No real argument to the contrary has here been asserted.

██ Dr. Fong was permitted to place literally a boxful of documents before this court and the panel, which along with other submissions, included everything that could possibly be relevant, and the same was allowed in a manner which clearly meets the requirements of procedural due process. The university's procedural due process, to suffice, does not require, as admitted and agreed in open court, the full-blown application of either the Federal Rules of Civil Procedure or Evidence. Moreover, Dr. Fong had the benefit of highly talented counsel who advocated just as vigorously in his behalf before the panel, as before this court. Any problems that might have arisen in this regard from the fact that the university panel proceeded without Dr. Fong and without his counsel at the early stages, were adequately obviated by permitting him to call witnesses at a time when counsel was present. He was afforded an opportunity to cross-examine witnesses and to present his own witnesses. He was provided full and complete notice of the charges against him, and had an opportunity to confront and challenge those charges. Considering the record in its totality, and not in isolated segments, it is difficult to imagine what other procedural due process the officials at Purdue University could have provided to Dr. Fong. Therefore, there is no basis for the claim here that the officials at Purdue University violated the plaintiff's procedural due process rights.

The second claim has to do with the charge of retaliation against Dr. Fong because of his exercise of free speech rights under the First Amendment of the Constitution of the United States, including his right to petition governmental officials. There can be no doubt, as evidenced in this record, that Dr. Fong exercised his rights to petition the government and his free speech rights with a vengeance. These free speech rights are not absolute. It is at least judicial folklore, now three quarters of a century old, that one cannot yell "fire" in a crowded theatre when there is no fire. It could be equally true that a professor of chemistry cannot make twenty or so uninvited telephone calls to the home of a university dean in the course of one evening, the last of which was made at four o'clock a.m. This court credits the testimony that such conduct is precisely what occurred in the not too distant past.

This record illustrates clearly that no objective basis exists for Dr. Fong's interpretation of events, nor for his excesses. Totally aside from his long-standing and extensive exercise of First Amendment speech and petition rights, there are numerous reasons for the actions which Purdue officials, after long-suffering, have now taken. Additionally, there is no objective basis for allegations that persons at Purdue University, the Federal Bureau of Investigation, the Department of Justice and state and local government engaged in

criminal conduct. With the possible exception of the so-called break-ins into the plaintiff's office, there is no evidence of criminal conduct of any kind in this record. Repeated charges of conspiracy and fraud do not a crime create.

In reference to Dr. Fong's credibility, he has exhibited a pattern of conduct which involves engaging public officials and university officials in lengthy conversations and harangues. This record is replete with examples of persons who have exercised extreme patience with this plaintiff. For the most part these persons have extended the courtesy of listening or remaining silent, and have then attempted to extract themselves from such conversations as soon as possible, without having adopted Dr. Fong's point of view in any way. The plaintiff has routinely interpreted such a response as agreement, support or concurrence. This pattern is certainly true of Dr. Fong's dealings with F.B.I. Agent, Walter Valentine, and of the plaintiff's conversations with a number of persons in authority at Purdue University.

As a result of his bad habits, Dr. Fong's closest friends and supporters, who obviously wished him well in the professional sense, have been shown to have eventually ceased any communication with him. This understandable decision to guard against further communication was typically followed by a wave of threats, harassments and intimidation on the part of Dr. Fong, which went well beyond the acceptable exercise of free speech. Although this court is not a social agency and as such cannot here enforce such extraneous views, it must confess that it was deeply moved by the letter of one of Dr. Fong's colleagues, attached to this opinion as Appendix "D". This court understands and concurs in the spirit of that letter and of those who have attempted to express concern, the same having gone to the point of suggesting that professional help be sought. Obviously, it is beyond the authority of this court to enact a social welfare solution to what has, no doubt, been a traumatic and deeply troubling situation for all concerned.

It is further not for this court to decide whether the officials at Purdue University have acted in total wisdom in dealing with Dr. Fong and the problems relating to him. Under Article III of the Constitution and this country's federalistic framework, the basic decisional process of a large state university must and should be vested in the authorities at that university under legislation created at the state level and certainly, in modern times supplemented by federal legislation. The basic decisional processes in that sense are administrative and legislative ones at state, federal and local levels. Unless the Constitution of the United States is clearly implicated, it is not for this court to interfere with those ongoing processes.

Perhaps transcending all other matters in this case, is the concern that the primary business of a great state university, a land-grant college, is to engage in education and research. Certainly, in the context of a constitutional society, such as our own, a state university must operate within established laws and within the provisions of the state and federal constitution. Part of its obligation, to be sure, is to guarantee to tenured professors the necessary incidence of due process. Here, however, it is all too apparent that if every professor demanded of a university the attention and approval here demanded by Dr. Fong, the system itself would likely collapse, destroying and undermining the basic purposes of education. It is difficult for this court to conceive how President Beering and others in high authority at Purdue University would be able to properly fulfill their statutorily established obligation to provide education and conduct research, if expected to be monopolized by the kind and extent of Dr. Fong's demands. If Dr. Fong's scientific accomplishments are as monumental as he claims, and this court is not required to and does not pass judgment on that subject, it is very unfortunate that he has engaged in excessive conduct which has placed him beyond First Amendment protection.

This court is well aware that when the facts of a case involve a public official's claim of defamation, which is not the case here, that official must prove the concept

of actual malice, as defined in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. Although this court does not have to cross such a bridge in this case, the egregious and excessive conduct of Dr. Fong in some instances might well be the basis of a claim for defamation by certain public officials at Purdue University, and in the state and federal governments, even within the First Amendment limitations placed thereon by the majority in *New York Times.*

■ A final area that must here be addressed concerns the burdens that are assigned by Justice Rehnquist in *Mount Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), in which it is made clear by application to this case, that Dr. Fong must prove that his exercise of First Amendment rights played a significant role in the proceedings now pending against him at Purdue University. The essential law of *Mount Healthy,* contained in the final paragraphs of that case, remains alive and well and binding on this plaintiff. After four days of testimony, plus an earlier day of preliminaries, Dr. Fong has failed to establish that his valid exercise of First Amendment rights was a substantial or motivating factor in the university's decision to proceed with censure and/or dismissal. The record before this court, independent of any record that was before the panel committee, demonstrates an abundance of evidence to sustain the conclusion that an independent basis existed for that action, based on the unprofessional conduct of this obviously talented chemistry professor.

This court has been presented with no basis under the Constitution of the United States, either the Fourteenth or First Amendments thereof, to intervene at this point with the ongoing processes that have been commenced at Purdue University in relationship to Dr. Francis Fong. After a careful review of this record and the argument of counsel, this court has reached the conclusion that under Rule 65 of the Federal Rules of Civil Procedure, there is correspondingly no basis for the granting of a preliminary injunction to the plaintiff. Therefore, the same is now DENIED at plaintiff's cost. The Clerk shall enter judgment accordingly. IT IS SO ORDERED.

## APPENDIX A

PURDUE UNIVERSITY

September 15, 1987

VARRO E. TYLER
EXECUTIVE VICE PRESIDENT
FOR ACADEMIC AFFAIRS

Professor Francis K. Fong
Department of Chemistry
Purdue University
WTHR—West Lafayette Campus

Re: Statement of Charges Under
*Executive Memorandum No. B–48*

Dear Professor Fong:

As you are aware, in May of this year, thirty of the senior faculty members in the Department of Chemistry filed petitions with President Beering stating their belief that your conduct

"... as represented (among other things) by [your] continued harassment of faculty and administrators, [your] public accusations of misconduct and fraud directed at individual faculty and administrators here and elsewhere, and [your] similar accusations directed at Purdue University and other institutions and agencies, is improper, disruptive, and injurious to the Department and University."

The petitions further contained the following statement and request for action by the President:

"... Despite the efforts of many faculty and administrators to assist Professor Fong, this behavior has continued for almost a decade now. The massive amounts of material distributed by Professor Fong in recent months indicate that it will continue unless strong action is taken. We urge you to use whatever administrative measures you have at your disposal, including the possibilities of censure or censure and dismissal, to help us correct this situation."

In response to these petitions, President Beering invoked the informal procedures provided for in Part III, paragraph 2 of Executive Memorandum No. B–48 and delegated Dean Kenneth Kliewer as his repre-

sentative to meet with you to discuss and seek resolution of the matter. These discussions, however, did not result in any such resolution, and accordingly Dean Kliewer addressed to you and President Beering his written recommendation, dated July 14, 1987, "... that formal procedures relating to possible termination of tenured faculty members (as set forth in Part III.3. and Part IV of Executive Memorandum B–48) be instituted" in this case.

President Beering has accepted this recommendation and has authorized me, as his representative, to initiate the formal procedures by giving you the following written statement of the charges upon which the proposal for your censure or termination is based:

Improper conduct injurious to the welfare of the University, consisting of

1. Continued harassment and attempted intimidation of, and issuance of various threats against, numerous members of the faculty and administration of Purdue University, over a period of years;

2. Making improper and disruptive public accusations of misconduct and fraud, directed against individual members of the faculty and administration of Purdue University and against various other individuals, over a period of years; which accusations have been broadly distributed by you to numerous public officials, governmental agencies, scientific groups and others, in a manner tending to damage the reputation of Purdue University, its administration, faculty members and various third persons referred to in such accusations. Such accusations have also included repeated misstatements by you, to the effect that various law enforcement officers had advised you that members of the Purdue administration and faculty, and others, had violated criminal laws.

3. Harassment and overbearing treatment of secretaries and other Purdue University staff members;

4. Misappropriation of certain computer and related equipment belonging to the Gas Research Institute;

5. Insubordination, by taking an unauthorized vacation during the 1987 spring semester, in direct violation of Department Head Pardue's denial of permission;

6. Insubordination, by refusing to meet the first two class sessions of your assigned course during the 1987 summer school, resulting in cancellation of one class session and added expense to the University;

7. Misappropriation of University resources by using University secretarial employees and University facilities to conduct your private personal and business transactions; and

8. Misrepresentations to other faculty members as to having special authority in the selection of the new Dean in 1985 and Department Head in 1986, and related attempts to influence such selections.

I am enclosing a copy of Executive Memorandum B–48 for your information. Another copy of that memorandum together with a copy of this Statement of Charges is being sent to Professor Tilden W. Perry, Chair of the Facutly Committee on Censure and Dismissal Proceedings. I am requesting Professor Perry to convene that Committee, and to set a time and place for the formal hearing of this case, all as provided for in Executive Memorandum B–48.

Very truly yours,
(s) Varro E. Tyler
Varro E. Tyler
Executive Vice President
for Academic Affairs

VET:lm
Enclosures
cc:  President Steven C. Beering
Professor Tilden W. Perry

## APPENDIX B

### STUART & BRANIGIN

LAWYERS

THE LIFE BUILDING

POST OFFICE BOX 1010

LAFAYETTE, INDIANA 47902

November 13, 1987

James K. Wheeler
COOTS HENKE & WHEELER
255 E. Carmel Drive
Carmel, IN 46932

RE: *Professor Frank K. Fong*

Dear Jim:

This letter is in response to your letter directed to Dr. Tyler of October 28, 1987 and your letter directed to me of November 5, 1987.

1. *Request for Petition signed by the thirty faculty members in the Department of Chemistry.*

I have enclosed the Petition herein for your records.

2. *Request for more specific and complete details of the charges concerning Frank Fong. Charges 1 and 2.*

As Dr. Fong realizes, most of the conduct that forms the basis of charges 1 and 2 derive from the vast amount of documents he has circulated from 1981 to 1987 to the Department of Energy, the National Science Foundation, Senator Lugar, Congressman Myers, the Federal Bureau of Investigation, Tippecanoe County Prosecutor's Office, Purdue University Police Department, the Indiana State Police, to various Purdue Administrators including but not limited to President Beering, former President Hansen, Vice–President Ford, Dean Yackel, Dr. Tyler, Dean Kliewer, Dr. Pardue, Dr. Margerum, Dr. Robinson, Dr. Benkeser, Dr. Angell, and Dr. Morrison.

In many of these documents, Dr. Fong has threatened or attempted to intimidate various Agency officers, Purdue Administrators, Purdue faculty and staff, and other governmental and university personnel with criminal and civil investigations or that the aforementioned were found to have committed criminal acts by these investigations. Dr. Fong has continually copied various people about criminal "charges", "conspiracies", "frauds", "plots" and "colleboations" involving the above mentioned governmental agencies, Purdue administrators and faculty members over a period of several years. This conduct constitutes harassment and is disruptive to the teaching and research of these agencies, faculty members and administrators. It is my understanding that Dr. Fong has copies of all of these letters and documents because he continues to re-circulate them. A review of the material that Dr. Fong has written will more than adequately apprise you of the nature of the conduct that comprise charges 1–2. I will allow you to inspect all the documents the University will use as exhibits prior to the hearing.

Further, Dr. Fong circulated in these documents information that he knew was false or he knew was in total disregard of the truth. For example, the Indiana State Police, investigators George Ross and Bill Nave, advised Dr. Fong that they could find no evidence of indictable crimes as charged by Dr. Fong. In response, Dr. Fong wrote the Indiana State Police a letter in late May complaining about the results of its investigation. Despite knowing that no indictable offenses had been found by the State Police, Dr. Fong continued to write extensively throughout June and July of 1987 to the above mentioned agencies and public officials that investigators Nave and Ross had found indictable offenses.

Also, the FBI deny having told Dr. Fong it found indictable offenses. In fact, the FBI has written to Dr. Fong on two occasions informing him that they had found no violation of federal statutes. Yet, Dr. Fong has misrepresented to various agencies, administrators and faculty members concerning the results of these "investigations" in an attempt to damage the reputations and the credibility of Purdue University and Fong's targeted faculty and administrators.

Fong has made harassing and threatening phone calls and/or statements to Dr. Hansen and his wife, Dr. Benkeser, and his wife, Dr. Margerum and his family, Dr. Pardue, Dr. Haas, President Beering, Dean Kliewer, Dr. Robinson, Dr. Angell, Dr. Tyler, Dr. Honig, Dr. Yackel and Dr. Clark.

*Charge No. 3. The charge of harassment and overbearing treatment of secretaries and staff members.* The following incidents are representative of the pattern of overbearing and harassing treatment by Professor Fong:

1. Jane Biddle/Star Crystal incident—reported assault 7-1-74.

2. Thomas Greenbowe: Chemistry lecturer

Beverly Lawler—microphone destroyed and subsequent intimidation of Greenbowe. 4–7–80

3. R.J. Fosnaugh—threatened Fosnaugh to "stay clear" after Haas shoving incident. 10–3–80.

4. Dr. Zara Welch—Chemistry Business Office—telephone harassment and threats. 8–18–80

5. Dick Lindsey—threatened Lindsey. 1–8–82

6. Judy Heine—Secretary intimidated. 9–86

7. Sgt. Dietrich—Harassed and threatened Dietrich concerning Fong's "alleged" burglary. 9–25–86

8. Shari Coomey—harassed. 5–4–87

*Charges No. 4, 5 & 6.* I believe these charges as drafted are sufficient.

*Charge No. 7.* This charge primarily has its genesis in Fong's use of secretarial help in late 1981 and early 1982 regarding his real estate business. The secretaries who are primarily involved are Tamara Gibson, Susan Julius and Marian Jones. Dr. Ford and Al Dawson, the internal auditor, corresponded with Fong during this time period regarding the issues.

Furthermore, Fong has misappropriated University resources by using secretarial employees and University resources to conduct his personal battle with the National Science Foundation, Department of Energy and General Electric.

*Charge No. 8.* I believe it is sufficiently drafted to advise Dr. Fong the nature of the charge.

*Request # 3. Request for Production of Documents.* Executive Memorandum B–48 does not require the University or the faculty member to exchange discovery. As indicated below, the University will provide names of all witnesses and allow inspection of the documents it will use at the hearing.

*Request No. 4. Your request regarding the details of the procedures that will be followed at the hearing.* We have already discussed these matters with Dr. Perry on October 28, 1987.

*Request No. 5. Request for list of Chem. Dept. Exec. Committee for the last*

*ten years.* I will not provide a list for you. I think it is irrelevant. However, if you would write to me explaining how it is relevant, I will reconsider my position.

*Request No. 6. A Complete List of Salaries and all Chemistry Department Professors for the Past Ten Years.* I will not provide a list for you. I think it is irrelevant. However, if you would write me explaining how it is relevant, I will reconsider my position.

*Request No. 7. Dr. Fong's Personnel File.* Will be provided.

*Request No. 8. Exhibits and Witnesses.* Names of all witnesses to testify at the hearing will be provided. Exhibits will be available for inspection at least one (1) week prior to the hearing.

If I can be of further assistance, please so indicate.

Very truly yours,
William E. Emerick

WEE/lrp

Enclosures

APPENDIX C

PURDUE UNIVERSITY

WEST LAFAYETTE, INDIANA

Office of the President

July 1, 1977

EXECUTIVE MEMORANDUM No. B–48

(Supersedes Executive Memorandum No. B–38)

To: Chancellors, Deans, Directors, and Heads of Schools, Divisions, Departments, and Offices

Subject: Principles and Policies for Academic Freedom, Responsibilities and Tenure, and Procedures for Termination of Faculty Appointments for Cause

Application: This Memorandum applies to all members of the Purdue University faculty

I. *Principles*

1. A faculty member shall have full freedom as a researcher, scholar, or artist.

He/she shall be assured freedom to communicate his/her work, to advocate solutions to human problems, and to criticize existing institutions. This freedom is subject only to adequate performance of his/her academic duties and to obligations he/she may have voluntarily assumed in accepting such support for his/her research. It should be recognized that research activities are also subject to University policies on patents, copyrights, and inventions set forth in Executive Memorandum No. B–10 or succeeding memoranda and, where applicable, to duly established regulations designed to protect the rights and welfare of human subjects.

2. A faculty member shall have freedom in the classroom in discussing his/her subject, but he/she should avoid infringing upon his/her students' right to learn by introducing irrelevant subject matter.

3. A faculty member is a member of society; when he or she speaks or writes in that capacity freedom from University censorship or discipline shall prevail. The special position in the community enjoyed by a faculty member, however, imposes special obligations. As a scholar and a member of the University faculty, it should be remembered that the public may judge one's profession and the University by public utterances. A faculty member should make every effort to indicate that he/she is not a spokesman for the University. A faculty member who assumes a governmental or political position or responsibility with the full consent and knowledge of the University shall be protected in his/her tenure rights in the event of controversy arising from the performance of his/her duties.

4. By accepting appointment to the faculty, the faculty member assumes the responsibilities of teaching, administration, or research as assigned by the proper University authorities. It is expected that these duties will be carried out in accordance with the spirit and terms of USD 66–14, Standards of Academic Ethics Within the University.

## II. *Tenure Policies*

1. Appointments to the faculty are made by the Board of Trustees upon the recommendation of the President of the University. The terms and conditions of the appointment constitute and are set forth in a written contract of employment.

2. Tenure at Purdue University is a matter of policy and not a legal obligation binding on the University. Tenure policies are subject to change by the Board of Trustees, and it follows that all appointments to the faculty are subject to such changes. It is the policy of the University to renew appointments of faculty members who have attained tenured status, subject always to the availability of funds, the continuance of activities in the area of employment, and the absence of circumstances which would otherwise entitle the University to terminate the appointment for cause. Tenure is effective only at the particular campus of the University where it was acquired.

3. It is the intent of the University that tenure be acquired only as a result of positive action and never by default. The current policies concerning acquisition of tenured status are listed below. (These policies for acquisition of tenure are not intended to remove from the President of the University or his designees the power to terminate non-tenured or probationary faculty members after appropriate consultation.)

a. Full-time members of the faculty who hold the rank of professor, associate professor, assistant professor, or instructor are eligible for tenure. The procedures for obtaining tenure are as follows:

1) Tenure will be automatically granted upon promotion to the rank of associate professor or professor

2) The tenure of all other members of the faculty eligible for tenure will be determined during a probationary period not exceeding

a) three years for professors

b) four years for associate professors

c) seven years for assistant professors and instructors

3) Sometime not later than during the penultimate year of the probationary

period, the department head will convene the department primary committee to consider tenure. The same procedures and documents used in considerations of promotion will be followed. A positive vote of the primary committee will be documented and forwarded by the department with his/her own recommendation to the area committee. If the vote of the primary committee is negative, the department head may either forward the documentation to the area committee with his/her own positive recommendation or else inform the faculty member by letter that his/her employment will be terminated at the end of the probationary period.

The area committee of each school will be convened annually to consider all recommendations for tenure forwarded to it. The same procedures and documentations used in considerations of promotion will be used. The dean of each school will forward his/her recommendation and that of the area committee for final decision to:

a) the executive vice president and provost for tenure recommendations at the West Lafayette Campus, and

b) the chancellors for tenure recommendations at their respective regional campuses in accordance with the procedures approved for the respective campuses.

b. Also eligible for tenure are professors, associate professors, assistant professors, and instructors who hold part-time appointments of not less than 50% of full-time and whose duties include the normal responsibilities of full-time faculty members, including teaching, research, and service. The procedures for obtaining tenure are the same as those for full-time faculty members as described in a. above. However, the faculty member may request an extension of the probationary period by one, two, or three years. This request shall be made by a letter to the dean, with a copy to the department head, prior to the meeting of the primary committee during the penultimate year of the probationary period for full-time faculty as defined in a. above.

In the event of an adjustment to full-time status during the probationary period, the request for an extension of probationary time will be restricted as follows:

If the adjustment to full-time status occurs during the

a) first or second year, there will be no extension of probationary time

b) third year, there will be a maximum extension of one year

c) fourth year, there will be a maximum extension of two years

d) fifth or sixth year, there will be a maximum extension of three years.

A member of the faculty whose initial appointment is on a full-time basis and whose appointment is adjusted to a part-time basis during the first three years of service to the University may request an extension equivalent to the probationary time for those who begin with a part-time appointment. If the adjustment to part-time status occurs during the fourth or subsequent year of initial appointment, the probationary period will be the same as that of a full-time faculty member as stated in a. above.

c. Members of the faculty who hold appointments other than those listed in a. and b. above (e.g., lecturer, adjunct instructor or professor, associate staff, affiliate staff, etc.) are *not* eligible for tenure.

d. the accumulation of time toward tenure is expected to be on an uninterrupted basis as a full-time faculty member or a part-time faculty member as defined in b. above at one campus of Purdue University, but justifiable conditions or interruptions may be considered as a basis for deviation from this policy. Official leave without salary will not be considered an interruption of continuity of service but will not count toward the limits of probationary time. Different provisions concerning the length of the probationary period for faculty members coming to any one Purdue campus with professional experience at another institution or at a different Purdue campus may be made

in individual cases if set forth in the written contract of employment.

e. Administrative officers serve at the pleasure of the. Board of Trustees and there shall be no tenure in an administrative office. Further, there shall be no tenure associated with administrative titles carrying the phrase "with the rank of."

III. *Procedures in Cases of Termination for Cause*

1. a. *General.* In all cases in which the University proposes to terminate for cause the appointment of a faculty member who has previously acquired tenure, or to terminate for cause the appointment of a non-tenured faculty member prior to the expiration of the term of appointment, the following procedures set forth in this Memorandum shall apply and in all such cases the faculty member shall be entitled to a hearing before a committee of the faculty as provided herein. The procedures set forth herein do not apply to cases in which the appointment of a non-tenured faculty member has expired or will expire by its terms and the University does not grant such person a new appointment or does not renew or extend the term of his/her appointment.

b. *Committees of the Faculty.* On the West Lafayette Campus the committee of the faculty shall be the Faculty Committee on Censure and Dismissal Proceedings, as constituted under the provisions of Senate Document 68–38, with such amendments as may be approved by the University Senate and the Board of Trustees. On the Regional Campuses such hearings shall be held before comparable faculty committees.

2. *Informal Procedures.* Actual or potential controversies concerning the termination for cause of a faculty member should be resolved informally if possible. The President of the University or his designee (e.g., Executive Vice President and Provost or Regional Campus Chancellor) may discuss the matter with the faculty member in a personal conference. If this does not result in a solution of the problem

by mutual consent, or if the President of the University or his designee should desire faculty advice before opening discussion with the faculty member, the matter may be referred to the Faculty Affairs Committee of the University Senate (or comparable faculty committee at a regional campus). The role of this committee will be to inquire informally into the situation, using whatever procedures seem appropriate, and to advise the President of the University or his designee and the faculty member with particular attention to the desirability of effecting a resolution of the problem to the satisfaction of all concerned. If informal resolution is not possible, and if either the President of the University or his designee or the faculty member requests a formal hearing, formal proceedings may be instituted in accordance with the provisions of this document.

3. *Formal Procedures*

a. Adequate cause for termination of the employment of a faculty member from a tenured position or before the expiration of the term of appointment of a non-tenured faculty member will include proven incompetence, gross neglect of duty, moral turpitude, or improper conduct injurious to the welfare of the University. Other actions inconsistent with the responsibilities of a member of the academic community may provide adequate cause for removal, but the principles set forth in I. above shall not be violated. Improper conduct injurious to the welfare of the University either by individuals or by groups shall include (but not by way of limitation) obstruction or disruption of the teaching, research, administration, disciplinary procedures, or other University activities, or of other authorized activities on University premises, or inciting others to conduct having such effects.

b. In all cases in which the University proposes to terminate an appointment for cause before the end of the term of the appointment (whether or not the faculty member has acquired tenure), and if the matter has not been informally resolved, the President of the University, or his

authorized representative, shall initiate formal proceedings by giving the faculty member a written statement containing the precise charges upon which the proposed termination for cause is based. This communication shall inform the faculty member, by inclusion of a copy of this Memorandum, of the procedural rights that will be accorded him/her. The President or his authorized representative shall request the Faculty Committee on Censure and Dismissal Proceedings (or appropriate Regional Campus committee) to set a time and place for the formal hearing of the case. The Hearing Committee shall be constituted as described in Senate Document 68–38 or parallel Regional Campus documents. The faculty member shall, not less than one week before the date set for the hearing, submit to the President and to the Hearing Committee his/her written answer to the charges, or state that no hearing is desired. If the faculty member fails to answer the charges or states that he/she desires no hearing be held, the President may proceed with the termination or may request that the hearing be held.

c. The faculty member may be suspended during the proceedings involving him/her only if, in the judgment of the President, his/her continuance should threaten immediate harm to the faculty member, to others, or to the University. Before suspending a faculty member, the administration will, if feasible, consult with the Faculty Affairs Committee. Unless legal considerations forbid, any such suspension shall be with full pay.

d. The function of the Hearing Committee shall be to determine whether or not the faculty member is guilty of the charges set out in the written statement of charges. The Hearing Committee will conduct its hearings in private. The President of the University may attend the hearings, as may his representatives chosen to present the point of view of the administration. The faculty member may be accompanied by an advisor of his/her own choosing who may act as his/her counsel. The Hearing Commit-

tee will receive oral and written statements of witnesses and other evidence concerning matters set forth in the letter of the President of the University as desired by the President of the University or his designee, the faculty member, and the Committee.

The Hearing Committee will conduct the questioning of the witnesses and should secure the presentation of all evidence deemed important to the case. The faculty member and his/her counsel and the President of the University and his representatives will have the right to question all witnesses who testify orally, within reasonable limits.

The faculty member will have the opportunity to be confronted by all witnesses adverse to him/her, except under the most unusual and urgent circumstances or if the witness cannot appear. In any case, the identity of the witness, as well as his/her statement, must be disclosed to the faculty member. In the case of charges of incompetence, the testimony on this point should include that of qualified scholars.

The Hearing Committee shall give opportunity to the faculty member and his/her counsel and to the President of the University and his designated representatives, to argue orally before it. The Hearing Committee may, if it desires, request written statements.

Within a reasonable time after the conclusion of the hearing and the receipt of the transcript of the hearing, the Hearing Committee (by a majority vote of the entire Committee) shall determine whether the faculty member is guilty of each of the charges set forth in the written statement of charges. This determination shall be based solely on the evidence introduced at the hearing. The Committee shall prepare a written report setting forth its determination of guilt or innocence and shall also state its specific findings of fact supporting its determinations as to each charge. Copies of the report shall be furnished to the faculty member and to the President, and each of them or their representatives shall

have access to the record of the hearing. *The President shall take appropriate action in view of the report.*

## IV. *Review Procedures*

Either the faculty member or the President may, within 30 days after receiving the record of the hearing and the Committee report, *request a review* by the Board of Trustees. The Board's review shall be based on the record made during the hearing before the Hearing Committee, accompanied by full opportunity for either written briefs or oral argument, or both. If the Board affirms the determinations of the Hearing Committee, the matter shall be deemed closed and the *President may proceed* to terminate the faculty member if he/she has been found guilty of any of the charges. If the Board finds that the Hearing Committee's determinations and findings of fact are not supported by substantial evidence, or are otherwise improper, the Board shall return the matter to the Hearing Committee with a written statement of its reasons. The Hearing Committee shall reconsider the matter, receiving new evidence as deemed necessary. It shall then report its new determinations and findings of fact to the Board, with copies to the faculty member and the President. After considering the report, the Board shall make its final decision in the case, and the matter shall be deemed closed.

(s) Arthur G. Hansen
President

### APPENDIX D

May 5, 1986

Professor F.K. Fong

Department of Chemistry

Purdue University

Dear Frank,

This letter is to convey my concern about these letters that you have been addressing to me in recent weeks ... letters that I must say I can only look at with a sense of bewilderment and disbelief. At first I was just jarred and hurt by them. Now, however, that sort of reaction has turned to one more of sadness than anything else because I see someone whose company I have enjoyed on various levels over a period of time, in the act of making his life impossible. Your letters carry two strident messages. One is that anyone who tries to maintain a balanced friendship with you by ignoring the unusual manner in which you react to those who displease you, does so at his peril. The second is that one should never talk with you alone if one is in a position to forward or obstruct your objectives.

My experience of recent weeks has helped me understand a lot of the basis of the problems you are seeking to attribute to enemies and malicious rumors. Time is running out for you to realise that you are your own worst enemy, alienating, one after another, anyone who tries to have any positive influence on your interactions with other people, and on the possible resurgence of your scientific productivity. I know how you have interpreted past events, but I have also seen how [omission] proving you less than correct on this, despite what you boldly assert and what you probably also deeply believe. I also think that people are getting fed up to the overflow point with behavior which is that of a spoilt child, refusing to be told no by someone and believing that if he stamps loudly enough or bullies toughly enough, he'll get what he wants.

You did NOT know more about dielectric relaxation than anyone else in the world ten years ago as you asserted then, and I treated it as a joke when you said it, but probably you were serious I realise now. People who were real experts through years of work in the area hearing you saying that sort of thing would have had a different reaction, probably deciding that your work was to be looked at very carefully for flaws or to be disregarded *. I am

---

* I remember some unflattering comments from people who were at the Gordon Conference you were asked to speak at (THAT was a nice recognition, and an opportunity to promote your ideas) who disagreed with you. (This was in your hey-day, remember). How often is the

thinking that something close to this has happened in your other areas. If your work were as good as you have proclaimed you would have had your credit, despite your extravagance and despite anything anyone in you own department had ever said about you. Most people think reputations outside are quite independent of what home institutes say, good or bad.

If you have listened to that tape from our conversation in my office, which seems to be the source of so much of your current bitterness at me, you must surely wonder whether other people listening to it hear me saying the same things you have asserted in writing that I said. Does Margareta hear me saying what you seem to? Or are you hearing what, for some reason I don't see very clearly, you want to hear? Frank.... listen to that tape with Margareta and with an ear to what others will hear. If that tape contains evil and perniciousness, then the world is surely full of it and there's no hope.

I'm not afraid of legal action threats you make, and I think it's just plain extraordinary that you make them. I had no basis for thinking that you might profit from "professional help" when we went to lunch at the time in question. I just thought you were being very unconventional and a bit childish. I had no idea, as I do now, of what you must have been putting people through. My view is that you spent 10 years trying to get special treatment, from the time you first asked the university to invervene with NSF on your behalf when your proposal was turned down. A lot of people think about it less kindly than that. Many well-intentioned people have listened to you and hoped to get you interested in more practical ways of getting over the fallout from recent years of conflict and time loss. Most of them, including me, seem to have ended up on your enemies list. I wish you could see the problems a bit more clearly but you seem to believe only what you want to.

I'm hoping I may be able to enjoy your company in the future as before, but don't keep expecting me to change my reality for yours, because I can't.

Yours sincerely,
(s) C.A. Angell
Professor of Chemistry

---

Fong–Diestler paper referred to now? Was it *really* seminal work appropriate to the 'king' or just another paper good enough to get published in J.Chem.Phys. (which is good enough).